**PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al., Plaintiffs,**

v.

**Richard S. SCHWEIKER, Secretary, Department of Health & Human Services, Defendant.**

**NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, INC., et al., Plaintiffs,**

v.

**DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., Defendants.**

Civ. A. Nos. 83–0037, 83–0180.

United States District Court, District of Columbia.

Feb. 18, 1983.

Final Judgment March 2, 1983.

659

Nancy Buc, Weil, Gotshal & Manges,
John W. Nields, Jr., Howrey & Simon,
Washington, D.C., for plaintiffs.

Theodore C. Hirt, Robert S. Lavet, Brook Hedge, Lewis K. Wise, Dept. of Justice, Washington, D.C., Carol Conrad, Joel Mangel, Lynne Zusman, Dept. of Health & Human Services, Washington, D.C., Stanley S. Harris, U.S. Atty., J. Paul McGrath, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

FLANNERY, District Judge.

This matter comes before the court on the consolidated motions of Planned Parenthood Federation of America, Inc., and National Family Planning and Reproductive Health Association, Inc., for a preliminary injunction. Plaintiffs challenge final regulations issued by the Department of Health and Human Services ("HHS") which require grantees of family planning services funded by HHS to notify a parent or guardian of unemancipated minors when prescription contraceptives are provided to the minor by the grantee.[1] The regulations were promulgated by the Secretary of HHS pursuant to a 1981 amendment to Title X of the Public Health Service Act, 42 U.S.C. § 300 et seq. Plaintiffs seek declaratory and injunctive relief against enforcement of these regulations and have moved for issuance of a preliminary injunction from this court. For the reasons set forth below, plaintiffs' request is granted.

*Facts*

In 1970, Congress enacted the Family Planning Services and Population Research Act of 1970, Pub.L. No. 91–572, 84 Stat. 1504 (1970) which added Title X to the existing Public Health Service Act. This new title provided for federally funded family planning services, including prescription and non-prescription contraceptive drugs and devices, to all persons desiring such services. Title X was enacted in response to a growing congressional concern with the number of unwanted pregnancies in the United States, and the social and medical costs associated with such pregnancies.

Subsequent to its enactment, Title X was amended several times. In 1981, the Act was amended to require Title X grantees to encourage family participation in Title X programs. Section 300(a) the Act was amended to read as follows:

> The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). *To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.*

(Amendment emphasized).

On February 22, 1982, HHS proposed regulations to implement the new language found in § 300(a). *See* 47 Fed.Reg. 7600–7701 (1982). The proposed amendments to the HHS Title X grant regulations provide that grantees are required to notify the parents or guardians of an unemancipated minor, when prescription drugs or prescription devices are provided, within 10 days following the initial provision of services by the grantee.[2] The regulations further require that the grantee verify receipt of such notice, and without such verification, the

---

1. The regulations became final on January 26, 1983. 48 Fed.Reg. 3600 (1983). The regulations will become effective on February 25, 1983.

2. The final regulations provide, at 42 C.F.R. § 59.5(a)(12)(i)(A):

   When prescription drugs or prescription devices are initially provided by the project to an unemancipated minor, notify a parent or guardian that they were provided, within 10 working days following their provision. The

project must tell the minor prior to the provision of services about this notification requirement.... The project shall verify by certified mail (with restricted delivery and return receipt requested), or other similar form of documentation that the notification was received. Where the project is unable to verify that notification was received, the project shall not provide additional prescription drugs or devices to the minor.

grantee is prohibited from providing the minor with any further prescription services.[3] The regulations also provide that where state law requires the notification or consent of a parent or guardian to the provision of family planning services to a minor, grantees must comply with the state law.[4] Finally, the regulations modify the definition of "low income family" contained in 42 C.F.R. § 59.2. The modification deletes a prior provision requiring Title X projects to treat unemancipated minors who wish to receive confidential medical services on the basis of their own resources. The modification requires adolescents to be considered on the basis of their family's income.[5]

Soon after the regulations became final, the plaintiffs brought this action. Plaintiffs argue that each of the new regulations is in violation of the statutory language found in Title X, and the congressional intent underlying the 1981 amendment to Title X. Plaintiffs argue, additionally, that the regulations are arbitrary and capricious. Finally, the plaintiffs argue that the regulations violate the constitutional rights of minors because they restrict the rights of mature minors to receive contraceptive services.

*The Classes*

A number of organizations and individuals have joined in these consolidated actions. The Planned Parenthood suit is brought by the Planned Parenthood Federation of America, a national organization concerned with family planning and three of its member affiliates: Planned Parenthood of Metropolitan Washington, D.C., Planned Parenthood of New York City, Inc., and Planned Parenthood of Maryland, Inc. The member affiliates are Title X grantees who provide family planning services to participants, and are subject to HHS grant regulations. Also named as a party plaintiff in the Planned Parenthood action is a physician associated with the Washington, D.C. affiliate of Planned Parenthood, and four other individuals: "Nancy Noe" a mother of a mature, unemancipated minor, "Larry Loe", a father of such a minor, and "Jane Doe" and "Mary Roe", unemancipated mature minors.[6]

The second suit was brought by several organizations including the National Family Planning and Reproductive Health Association, Inc. ("NFPRHA"). NFPRHA brings this action for itself and on behalf of its members. The organization is a national non-profit corporation whose members are predominantly family planning clinics who are direct grantees receiving Title X funds. Joining with NFPRHA in its action are the Family Planning Council of Western Massachusetts, Inc., one of NFPRHA's members, the South Carolina Department of Health and Environmental Control, the Association of Planned Parenthood Professionals, Inc., an organization of health care professionals associated with programs receiving Title X funds and who provide family planning services to minors, the United States Con-

---

**3.** The regulations also require the grantee to keep records of the notifications provided under the regulations, and of the determinations made under the exceptions thereto. 48 Fed. Reg. at 3614 (1983).

**4.** The final regulations provide, at 42 C.F.R. § 59.5(a)(12)(ii):

Where State law requires the notification or consent of a parent or guardian to the provision of family planning services to an individual who is an unemancipated minor under State law, provide such services only in compliance with such law.

**5.** The final regulations, at 42 C.F.R. § 59.2, have been altered as follows:

"Low income family" means a family whose total annual income does not exceed 100 per

cent of the most recent Community Services Administration Income Poverty Guidelines .... "Low income family" also includes members of families whose annual family income exceeds this amount, but who, as determined by the project director, are unable for good reasons, to pay for family planning services. *For example, unemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources.* (Sentence deleted by new regulations emphasized).

**6.** By order dated January 18, 1983, the court granted plaintiffs' permission to proceed pseudonymously.

ference of Local Health Officers,[7] and Steven Sondheimer, Director of the Family Planning Program at the Hospital of the University of Pennsylvania.[8] By order dated January 27, 1983, the Planned Parenthood and the National Family Planning cases were consolidated for the purposes of this action.

■ On January 28, 1983, the Secretary moved for certification of a nationwide class. HHS requested this court to certify a class encompassing all unemancipated minors under age 18 who seek contraceptives from Title X grantees, the parents of such minors, and all grantees of Title X funds.[9] On February 7 and 8, plaintiffs submitted oppositions to the defendants' request and moved for certification of a more circumscribed class. Planned Parenthood moved for certification of four classes: (1) a class of Planned Parenthood member affiliates who are grantees of Title X funds and who serve unemancipated minors under age 18; (2) a class of physicians retained by member affiliates to provide contraceptive services to minors; (3) a class of parents of mature minors under age 18 who oppose the notification requirement; and (4) a class of mature minors under age 18 who wish to receive contraceptive services from Planned Parenthood without their parents being notified. NFPRHA moved to narrow the class, in its suit only, to members of the organization "consisting of family planning entities and persons receiving funding under Title X".

The court finds that plaintiffs' request to define the parameters of the action should be granted. The court finds, additionally, that plaintiffs' suggested classes comply with the requirements of Fed.R.Civ.P. 23(a). The membership of each of plaintiffs' classes is so numerous as to render impracticable joinder of all members of each class. Additionally, there are clearly questions of law and fact at issue that are common to the members of each class. If, for instance, the Secretary has acted in excess of his statutory authority, he has acted to the detriment of each member of the five classes plaintiffs seek to represent. The alleged unlawfulness of the regulations clearly presents questions of fact and principles of law identical to each member within each respective class.

Finally, the claims of the named plaintiff representatives of each class are typical of the claims of the members of their respective classes. By limiting their class to parents and minors who oppose the regulations at issue, the plaintiffs have avoided the difficulty of including among their class individuals who do not share an identity of interest with the class.

The court also finds that the representative parties will fairly and adequately protect the interest of each member of the respective classes. Named plaintiffs have interests co-extensive with, and not antagonistic to, absent class members, and each plaintiff's attorney is clearly qualified, experienced and able to conduct this litigation.

The court finds, in addition, that plaintiffs have met the requirements of Fed.R. Civ.P. 23(b). Rule 23(b)(2) provides, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding final declaratory relief with respect to the class as a whole." By promulgating the regulations, the Secretary has acted in a way that is uniformly applicable to the members of each class. Accordingly, the court finds

---

7. The United States Conference of Local Health Officers is an unincorporated association with its offices in the District of Columbia. It represents approximately 2,000 city and county health department directors and officers throughout the United States, many of which members administer and represent family planning programs using Title X funds. The Conference sues on its behalf and on behalf of its members.

8. The Family Planning Program receives Title X funds and provides a broad range of family planning services to adults and minors in the Philadelphia area.

9. Although requesting this court to certify a nationwide class, the defendant retained its right to object to each of the parties embraced by the class on grounds of standing.

that each class satisfies the terms of Fed.R. Civ.P. 23(b)(2) and that certification of the classes is appropriate.

*Standing*

The defendant objects to the standing of each of the individual, organizational, and governmental entities who bring this consolidated action. For the purposes of this motion, the court finds it unnecessary to address the objections raised by the Secretary with respect to each of the plaintiffs. This court finds that numerous plaintiffs are properly before this court, and are proper representatives of their respective classes.

■ To be afforded standing, a plaintiff must establish the existence of a genuine controversy of which it is the proper party to bring before the court. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). This requirement is typically divided into a number of separate inquiries: whether plaintiffs will suffer some injury in fact as a result of the challenged conduct; whether plaintiffs are within the "zone of interests" intended to be protected by the statute; and whether there is a causal connection between the threatened injury, and the regulations or rule at issue. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982).

■ This court concludes that the class consisting of unemancipated mature minors, as well as that consisting of the Planned Parenthood Federation and NFPRHA member affiliates who are direct and indirect grantees of Title X funds, have standing to bring this action.[10] With respect to the unemancipated minors, this court considers it clear beyond dispute that this class will suffer an increased risk of pregnancy as a result of these regulations.

The Secretary argues, however, that the named minors do not have standing, and presumably cannot serve as representatives of a class of minors, because the threat of injury which they allege is too speculative and hypothetical to support standing. The Secretary points out, needlessly this court believes, that notification does not cause pregnancy. The Secretary states that the notification requirement might not deter minors from attending a clinic, or that minors, even if deterred from attending a clinic, may obtain prescriptive contraceptives elsewhere, or rely upon non-prescriptive contraceptives. Finally, the Secretary suggests that any injury is speculative because a minor deterred from attending a family planning clinic, and unable to obtain contraceptives elsewhere may, by "an intervening act of free will" abstain from intercourse. Therefore, the Secretary concludes, the challenged regulations will not cause an increase in the number of unwanted teenage pregnancies, and minors cannot demonstrate an injury sufficient to confer standing.

The Secretary misconstrues the nature of the injury needed to support standing. A minor need not show that she will become pregnant as a result of the government's regulations, but only that her risk of becoming pregnant will increase materially. *See Cutler v. Kennedy,* 475 F.Supp. 838, 848–49 (D.D.C.1979). The statute giving rise to the regulations at issue here is designed to protect minors against the risk of injury, and minors need not prove, for standing purposes, that the regulations will result in unwanted pregnancies. *See City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975).

The studies and affidavits submitted by the plaintiffs convincingly demonstrate that the regulations will deter minors from attending family planning clinics and thereby increase their risk of becoming pregnant.[11]

---

**10.** The court does not, at this time, address the standing of each of the named plaintiffs. The court's conclusion that the classes consisting of minors and family planning clinics have standing to bring this action should not be interpreted to mean that other individual parties and classes in this action are without standing.

**11.** The most carefully conducted empirical study examining the question of whether adolescents would be deterred by a parental notifi-

The affidavit submitted by Mary Roe is also persuasive evidence of the deterrent effects of the regulations. Mary Roe is a sixteen year old unemancipated minor who states that she has visited a family planning clinic in order to obtain prescription contraceptives. She stated, "I absolutely do not want my mother to know about my sexual activity because I am sure that she would have a strong and painful reaction if she found out." Affi. Roe ¶ 5. Mary Roe also stated that if the notification requirement were in effect, "I would have to give up using contraceptives and risk becoming pregnant." Affi. Roe ¶ 5.

Despite the Secretary's contention that the plaintiffs' injuries are speculative, this court considers indisputable the fact that Mary Roe, and the class she represents, will suffer an increased risk of pregnancy as a result of these regulations. The affidavits submitted by the minor plaintiffs clearly indicate that the injuries threatened are both real and immediate, and are sufficient to meet the injury in fact requirement for standing. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).[12]

The court also concludes that the Planned Parenthood Federation, Inc., and NFPRHA may serve as representatives for a class of member affiliate family planning clinics. Such clinics are direct and indirect recipients of Title X funds and have standing to maintain this suit. The Secretary disputes the standing of the clinics, repeatedly characterizing the objections of these entities as "philosophical objections" which cannot substitute for the requirement of "injury in fact" required for standing. This court finds the Secretary's argument singularly unconvincing. The court does not read any of plaintiffs' claims of injury as rooted in moral, religious, or philosophical principles. The clinics do not argue that the regulations will erode their notion of what is right, or proper. The clinics indicate, quite simply, that the regulations will cause serious and systematic injury to the operations of the clinic.

First, the clinics note that, as beneficiaries of Title X funds, they have standing to object to conditions on their receipt of funds which threaten the statutory framework under which they operate. The Secretary maintains that the clinics are not injured by the new regulations because as voluntary Title X grantees they have chosen to participate in the grant program and are bound to · accept the conditions HHS places on their receipt of federal subsidies. According to the Secretary, objecting Title X grantees may withdraw from the program and provide contraceptive services without parental notification, or they may accept the funds without protest. They may not, according to the Secretary, challenge the regulations of the agency under which they operate.

Defendant's reasoning would, if endorsed by this court, prevent the plaintiffs from objecting to any grant regulation, however unreasonable or unconstitutional, because a grantee may refuse to participate in an objectionable federal program. Contrary to defendant's assertion, the law does not permit the government to present such a restricted set of options. Although plaintiffs have no right to a government contract, they are entitled to have grants dispensed lawfully. To the extent that funds are dispensed with unconditional or unlawful conditions attached, the plaintiffs are injured and have standing to object. *Scan-*

---

cation requirement has concluded that 23% of those currently utilizing family planning clinic services would no longer do so if a mandatory parental notification requirement was imposed. Torres, Forrest & Eisman, *Telling Parents: Clinic Policies and Adolescents' Use of Family Planning and Abortion Services,* 12 Fam.Plan. Persp. 284, 290–91 (1980).

**12.** Additionally, the court finds that the family planning clinics are properly before this court, and may assert the interests of unemancipated minor patients. The regulations, the clinics assert, will infringe upon the confidential nature of the relations between physician and patient, and limit their rights to provide health care to their clients. It is therefore appropriate for the clinics to litigate the rights of their patients. *See Singleton v. Wulff,* 428 U.S. 106, 114–117, 96 S.Ct. 2868, 2874–2875, 49 L.Ed.2d 826 (1975).

*well Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970); *Planned Parenthood Ass'n-Chicago Area v. Kempiners,* 531 F.Supp. 320, 323–24 (N.D.Ill.1981).

The clinics are not injured only through the alleged failure of HHS to promulgate regulations that are consistent with Title X and the congressional purposes embodied in that Act, but they will suffer professional and economic injury as a result of the regulations. The clinics have presented persuasive evidence demonstrating that the notification requirement will cause them to breach a guarantee of confidentiality that is frequently codified in state law, or established pursuant to clinic policy. The professional reputations of the clinics, and that of the professional health employees of the clinics, would be compromised if they were forced to reveal sensitive physician-patient information. The clinics therefore may assert their own rights to consult and treat their clients confidentially, and to protect confidential services from infringement. *See Planned Parenthood Ass'n v. Kempiners, supra* at 324 n. 3.

Conversely, if the clinics are forced to forfeit Title X funds in order to protect their medical judgments concerning patient confidentiality, the clinics will be injured. The clinics embraced by the classes represented by Planned Parenthood and NFPRHA are Title X beneficiaries. If they are forced to reject federal funds because of conditions they believe to be unlawful, they will be forced to curtail their operations substantially. This will result in a serious erosion in the availability of family planning services nationwide, to the detriment of the clinics and their clients.

Additionally, this court finds that the second requirement for standing, that plaintiffs be within the zone of interest sought to be protected by Title X, is met in this case. There can be no question that each of the classes of plaintiffs are intended beneficiaries of Title X funding. The purpose of Title X is to make family planning services available to all persons. Program participants, including unemancipated minors, are the ultimate beneficiaries of family plan-

ning services. Clinics are funded, and physicians hired, to deliver necessary confidential contraceptive services to participants. Title X grantees are relied upon by Congress to effectuate the intent of Title X, and it is clear that both the clinics and the unemancipated minor participants are within the zone of interests to be protected by the statute. *See Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972).

The final element of standing, "causation" or "redressability", presents no problems for these plaintiffs. The injury threatened each plaintiff is directly traceable to the challenged regulations. The regulations directly increase the risk of pregnancy for minors, and present the clinics with the choice of abridging physician-patient confidentiality, or sacrificing needed Title X funds. In addition, each plaintiff alleges that the regulations do direct violence to the statutory framework of Title X. Certainly, if this court grants plaintiffs the relief sought, these threatened injuries will be prevented.

*Injunctive Relief*

Plaintiffs seek, at this stage, preliminary relief preserving the status quo until this court can rule on the parties' motions for summary judgment. In this Circuit, a plaintiff's entitlement to a preliminary injunction depends upon the following:

> (1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal ... (2) Has the petitioner shown that without such relief, it will be irreparably injured? ... (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? ... (4) Where lies the public interest?

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977), citing *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958).

*1. Irreparable Injury*

As already noted, the plaintiffs have demonstrated forcefully that these regula-

tions will cause them immediate and irreparable harm. Forty state governments, and dozens of health and welfare organizations have submitted statements to the Secretary documenting their belief that teenagers will be deterred from attending family planning clinics by a parental notification requirement. Despite the government's assertion to the contrary, this court is convinced that minors will avoid clinics if the regulations go into effect.[13] The evidence also suggests that many minors will not quickly manifest the self-discipline counseled by the government, and will remain sexually active. It is quite clear that, as a result of these regulations, substantial numbers of adolescents will become pregnant and will either elect abortion, or suffer the consequences of unwanted pregnancies.

The Secretary's suggestion that sexually active adolescents may nevertheless escape injury by obtaining contraceptives elsewhere is not borne out by the evidence. The evidence submitted by plaintiffs suggests strongly that many adolescents denied access to family planning clinics cannot obtain prescription contraceptives elsewhere because they cannot afford them.[14] Nonprescription contraceptives, although relatively inexpensive, provide no better alternative because they are significantly less effective than prescription contraceptives.

The plaintiffs point out that the recognized success of the family planning clinics in attracting adolescents is directly attributable to the well publicized and zealously guarded policy of confidentiality ensured by the clinics. It is abundantly clear to this court that many teenagers will be deterred from attending these clinics as a result of the parental notification requirement, and that the trust and client support established by the clinics over the past decade may be irretrievably lost.

In addition, the Title X grantees will suffer irreparable injury if these regulations go into effect. Planned Parenthood and NFPRHA claim that the parental notice requirement will force them to breach their duty of confidentiality to participants. This confidentiality is not only part of the professional responsibility of the health care professionals, but has been codified in the law of many states. This duty has been long recognized as inviolate by the clinics, particularly with respect to sensitive information such as a patient's decision about sexuality or contraceptives.

The Secretary argues, in strained fashion, that confidentiality will not be compromised by these regulations. The Secretary makes this argument through the simple expedient of making a waiver of confidentiality a condition of services. Since a minor must waive confidentiality prior to receiving contraceptive services, the Secretary argues that there is no guarantee of confidentiality to be breached. However, the essentially coercive circumstances under which a minor makes her "choice" does not act to vitiate the breach of confidentiality that notification entails. Confidentiality in the patient-physician context encompasses the private and privileged nature of all information conveyed in a health care transaction, including the knowledge that such a transaction is taking place. The threatened breach of a physician's obligation to ensure confidentiality exists whether or not a waiver can be forcibly extracted prior to providing services.

13. *See* note 11 *supra*. Several experienced health care professionals have submitted affidavits in which they estimate that if a clinic were to implement the regulations, two out of five minor patients would not return to the clinic. Affi. Janney, ¶ 8; Affi. Cappa, ¶ 6. In fact, anecdotal evidence indicates that the mere *proposal* of the notification requirement has resulted in a significant drop in adolescent attendance at family planning clinics. Kenney, Forrest & Torres, *Storm Over Washington: The Parental Notification Proposal,* 14 Fam. Plan.Persp. 185, 189 (1982).

14. A study by the Alan Guttmacher Institute, tabulating reasons why adolescents attend family planning clinics rather than a private physician reveals, not surprisingly, that 60% of adolescents surveyed chose the clinic because a doctor is too expensive. Over 30% fear that private physicians might tell their parents of their request for contraceptives. NFPRHA Mem.App. 12, Table 8.

Finally, the member affiliates point out that they will be injured financially if they choose to reject Title X funds rather than comply with regulations they believe to be unlawful.[15] Such threatened financial loss is serious and direct, and constitutes sufficient injury to meet the first requirement for a grant of a preliminary injunction.[16]

### 2. *Likelihood of Success on the Merits*

■ Plaintiffs make a number of arguments in support of their contention that the regulations are unlawful. Initially, the plaintiffs argue that the new regulations contravene congressional intent, and have been promulgated in excess of statutory authority. Section 706(2)(C) of the Administrative Procedure Act provides that a reviewing court shall hold unlawful and set aside agency action that is in excess of statutory authority. 5 U.S.C. § 706. A regulation will be sustained by the reviewing court if the court is "reasonably able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown,* 441 U.S. 281, 308, 99 S.Ct. 1705, 1720, 60 L.Ed.2d 208 (1979). In resolving this question, the reviewing court examines

> the express language of the statute involved and the content given that language by implication from the structure of the statute, its legislative history, and the general course of administrative practice since its enactment.

*Motor and Equipment Manufacturers Ass'n v. EPA,* 627 F.2d 1095, 1116 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). Plaintiffs argue that a review of the statutory language of the 1981 amendment to Title X, its legislative history, and the structure of Title X, will reveal that the regulations are unauthorized by Congress.

This court finds that such a review does lead it ineluctably to conclude that the regulations are unlawful, and that the plaintiffs are likely to succeed on the merits of their action. Turning first to the language of the statute itself, the court finds no grant of authority by Congress that reasonably contemplates the regulations promulgated by the Secretary. The 1981 amendment provides that, to the extent practical, Title X grantees "shall encourage family participation" in Title X programs. This court finds that the use of a permissive and nonobligatory term such as "encourage" reflects Congress' intent to counsel grantees to advise participants to involve their families in contraception decisions. Its use does not suggest that Congress intended to require family participation in such decisions.

The Secretary attempts to avoid the plain language of the statute by engaging in a process of statutory construction by selective underlining. The Secretary emphasizes that Congress expressly stated that grantees "*shall* encourage family participation". (Emphasis by Secretary). This statement, according to the Secretary, im-

---

**15.** Alfred Moran, chief executive officer of Planned Parenthood of New York City, Inc. stated for instance,

> The DHHS regulations challenged herein present PPNY with a Hobson's Choice. Title X funds comprise 82.3 percent of the income for the contraceptive program of the South Bronx clinic. PPNYC must either suffer loss of these funds, which will seriously cripple, if not eliminate, its ability to maintain the South Bronx clinic and serve the youth of the community, or it must violate its professional and legal obligations to protect the confidentiality of its unemancipated minor patients.

Affi. Moran ¶ 12 Mary Janney, executive director of Planned Parenthood of Metropolitan Washington, D.C., Inc., stated that Title X funds distributed to the two planned parenthood clinics in the District of Columbia accounted for 63% of the actual expenses of those clinics. Affi. Janney ¶ 4.

**16.** The requirement that unemancipated minors provide clinics with information about family income also results in irreparable injury to plaintiffs. Many adolescents have only a vague notion of their family's income, and will be required to obtain specific and verifiable information from their parents. In most instances, adolescents will be required to explain why they seek such information. Accordingly, the requirement presents the same danger of deterring adolescents from attending the clinics as does the notification requirement. In addition, parents may effectively block their child's access to contraceptive services by refusing to give the information, or by refusing to pay for services if the parental income is too high.

poses a non-discretionary duty on grantees, and reasonably encompasses a parental notification requirement.

This court finds the Secretary's reading of the statute unpersuasive. The word "shall" remains an auxiliary verb in that sentence, and is auxiliary to the non-mandatory word "encourage." Thus grantees are required to encourage family participation, but they cannot take definitive, irrevocable steps that will invariably result in family participation in a minor's family planning decision.[17]

If any doubt exists with respect to the nature of the duty imposed on grantees by the 1981 amendments, it is resolved clearly by the legislative history to that amendment. The Conference Committee report explains the 1981 amendment in the following terms:

> The conferees believe that, while family involvement is not mandated, it is important that families participate in the activities [of Title X programs] as much as possible. It is the intent of the conferees that *grantees will encourage participants in Title X programs to include their families in counseling and involve them in decisions about services.*

H.R.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 1161 (emphasis added). The Conference Committee explanation is entirely consistent with the statute itself, and clearly expresses Congress' intent to encourage minors to involve their families in family planning decisions, but not to require clinic personnel to notify a minor's parents over the minor's objection.

The legislative history to Title X also supports plaintiffs' argument that a mandatory parental notification requirement is inconsistent with congressional intent. The original enactment of Title X and its subsequent reenactments were motivated predominantly by congressional concern with stemming the increase in unwanted births and pregnancies. Family Planning Services and Population Research Act of 1970, Pub.L. 91–572, 84 Stat. 1504.

In 1978, Congress directly addressed the problem of adolescent pregnancies by amending Title X to require that all projects under the Act "offer a broad range of acceptable and effective family planning methods and services (including ... services for adolescents.)" 42 U.S.C. § 300(a). The reports of several congressional committees charged with drafting the Title X amendments expressed extreme concern with the teenage pregnancy rate. S.Rep. No. 822, 95th Cong., 2d Sess. 27 (1978); H.R.Rep. No. 1191, 95th Cong., 2d Sess. 31 (1978).

Congress understood further that confidentiality was an essential ingredient to the success of family planning clinics. S.Rep. No. 102, 95th Cong., 1st Sess. 26 (1977), U.S.Code Cong. & Admin.News 1977, p. 549; S.Rep. No. 822, 95th Cong., 2d Sess. 31 (1978). The issue of confidentiality was addressed directly by Congress during the debate on a proposed amendment to Title X offered by Representative Harold Volker in 1978. The Volker Amendment would have required Title X clinics to notify the parents of an unemancipated minor prior to prescribing prescriptive contraceptive drugs or devices. 124 Cong.Rec. 37,044 (1978). The amendment was, therefore, virtually identical to that now challenged by the plaintiffs. The House rejected the amendment, noting that if enacted, a parental notification requirement would undermine the intent of Title X. Congress made it clear that Title X providers treating adolescents were to respect their patient's confidentiality because a contrary rule would contravene the overriding congressional intent of arresting the epidemic of teenage pregnancies.

---

17. The court's reading of the plain language of the statute was also shared by the General Counsel of HHS. The General Counsel of HHS advised the Secretary in 1981 that any regulation purportedly implementing the 1981 amendment should "be limited to requiring Title X grantees to encourage unemancipated minors seeking counselling, or other services, to involve their family, to the maximum extent possible, in these activities." Plaintiffs' Mem.App. E.

There is no indication that the 1981 amendment was meant by Congress to signal a reversal of this longstanding assurance of confidentiality in the services provided under Title X. This court must conclude, from the evidence presented before it upon this motion, that the parental notification regulations are outside the scope of the agency's authorizing legislation, and are therefore invalid.

This court finds similar flaws in the other regulations challenged by plaintiffs: (1) a regulation delegating power to require parental consent or notification to the states; and (2) a regulation redefining the financial eligibility standards for Title X services.

██ Although Congress is free to permit the states to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states. Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs. Accordingly, such a regulation is unlawful.[18]

██ The regulations requiring a minor's eligibility for services to be considered on the basis of her family's income is also inconsistent with the statutory scheme underlying Title X, because it has the same effect as the parental notification requirement. In order to determine whether she is qualified to receive services from the clinic, a minor would be required to obtain financial information from her parents. If her parent did not meet the eligibility requirements for subsidized services, the minor would be forced to obtain money from her parents to pay for services, or pay for the services herself. In any event, the regula-

tion creates a *de facto* parental notification requirement. In the event that her parent is sufficiently affluent, and the minor has no funds of her own, the economic eligibility regulation imposes a *de facto* consent requirement. A parent could prevent her child from receiving contraceptive services simply by refusing to pay for them. The regulation thus imposes an economic deterrent to services in addition to the deterrent created by the *de facto* notification requirement itself. Title X was enacted to stem unwanted pregnancies. The financial eligibility requirement violates the purpose underlying Title X and finds no support within the Act or its most recent amendment. It is, therefore, unlawful.[19]

An appropriate Order accompanies this Memorandum.

## ORDER

This matter comes before the court on the parties' motions for class certification, and on the plaintiffs' motion for a preliminary injunction. After consideration of the memoranda submitted in this matter, and after hearing oral argument with respect to the plaintiffs' motion for a preliminary injunction, it is, by the court, this 18th day of February, 1983,

ORDERED that the defendants' motion for nation-wide class certification is denied; and it is further

ORDERED that the motion of Planned Parenthood Federation of America, Inc. and the National Family Planning and Reproductive Health Association, Inc. for class certification is granted; and it is further

ORDERED that the Planned Parenthood classes shall consist of:

---

**18.** Even if Congress had authorized the Secretary to delegate eligibility criteria for Title X programs to the states, the parental notification and consent requirements subsequently established by the states would be invalid. To be valid, the state laws must be consistent with the intent of Title X. *See Jones v. T__ H__,* 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976); *Doe v. Pickett,* 480 F.Supp. 1218 (D.W.Va.1979). As this court already determined, Title X does not permit the Secretary to establish a parental notification requirement, or a parental consent requirement. Therefore, the

states would be precluded from imposing such requirements.

**19.** Plaintiffs allege that the Secretary's regulations are irrational and without support in the rulemaking record, and that the regulations abridge mature minors' rights to privacy. Because this court has determined that the regulations are invalid because they have been promulgated in excess of statutory authority, it has no occasion to rule on plaintiffs' other claims.

(1) PPFA member affiliates which are direct or indirect grantees of Title X funds and which serve *inter alia,* unemancipated mature minor patients age 17 or under;

(2) Physicians retained by PPFA member affiliates to provide services to patients;

(3) Parents of mature minors age 17 or under who do not wish to receive government-mandated notification of their minor daughter's receipt of prescription contraceptive drugs or devices;

(4) Mature minors age 17 or under who want to be able to receive prescription contraceptive drugs or devices from Planned Parenthood affiliates without their parents being notified; and it is further

ORDERED that the National Family Planning and Reproductive Health Association class shall consist of all Title X grantees or subgrantees who are members of the National Family Planning and Reproductive Health Association, Inc., including their officers or employees and physicians and other medical personnel retained or employed by them, but not including affiliates of the Planned Parenthood Federation of America or any other class members who have already filed related suits in this or any other court; and it is further

ORDERED that defendants, the United States Department of Health and Human Services and Richard S. Schweiker, Secretary of the Department of Health and Human Services, cease the enforcement of the regulations amending 42 C.F.R. Part 59, published at 48 Fed.Reg. 3614 (1983), until further order of the court.

### FINAL JUDGMENT

This matter is before the court on cross-motions for summary judgment. Plaintiffs challenge final regulations issued by the Department of Health and Human Services ("HHS") which require family planning clinics receiving monies from HHS to notify the parent or guardian of an unemancipated minor when prescription contraceptives are provided to the minor by the grantee.

On February 18, 1983, this court issued a memorandum granting plaintiffs' request for a preliminary injunction and ordering defendants, HHS and Richard Schweiker, Secretary of HHS, to cease the enforcement of the challenged regulations until further order of the court. Subsequently, the parties submitted a joint stipulation that the pleadings filed for the motion for a preliminary injunction shall constitute the parties' pleadings on the cross-motions for summary judgment, and stipulating that the matter is now ripe for final judgment.

Even a cursory reading of this court's opinion of February 18, 1983 granting plaintiffs' motion for a preliminary injunction reveals this court's conclusion that the plaintiffs enjoyed not merely a substantial likelihood of success on the merits, but were entitled to judgment as a matter of law. This court concluded, upon a careful review of the pleadings, and after hearing oral argument in this matter, that the challenged regulations were invalid as clearly in excess of statutory authority.

Accordingly, for the reasons set forth in this court's opinion of February 18, 1983, it is, by the court, this 2nd day of March, 1983,

ORDERED, ADJUDGED and DECREED that the defendants' motion for summary judgment is denied; and it is further

ORDERED, ADJUDGED and DECREED that plaintiffs' motion for summary judgment is granted; and it is further

ORDERED that defendants, the United States Department of Health and Human Services, and Richard S. Schweiker, Secretary of the Department of Health and Human Services, are permanently enjoined from implementing or enforcing regulations amending 42 C.F.R. Part 59, published at 48 Fed.Reg. 3614 (1983).