The STATE OF NEW YORK and The New York State Department of Health, Plaintiffs,

v.

Richard S. SCHWEIKER, Secretary of the U.S. Department of Health and Human Services, Defendant.

MEDICAL AND HEALTH RESEARCH ASSOCIATION OF NEW YORK CITY, INC., Individually and on Behalf of its service divisions MATERNITY, INFANT CARE-FAMILY PLANNING PROJECTS and Project For Rockaway's Youth in Medical Essentials, and all others similarly situated; Dr. Donna O'Hare, and Dr. Harvey Simon, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Richard SCHWEIKER, or his successor, Secretary of the Department of Health and Human Services, Defendant.

Nos. 83 Civ. 0726 (HFW), 83 Civ. 0727 (HFW).

United States District Court, S.D. New York.

Feb. 14, 1983.

Robert Abrams, Atty. Gen., State of N.Y. by Deborah S. Bachrach, Alan D. Aviles, Lawrence S. Kahn, New York City, for The State and NYSDH.

Rhonda Copelon, Center for Constitutional Rights by Sarah Wunsch, Nan D. Hunter, American Civil Liberties Union by Suzanne Lynn and Janet Benshoof, New York Civil Liberties Union, by Steven R. Shapiro, New York City, for class action plaintiffs.

John S. Martin, Jr., U.S. Atty., S.D.N.Y. by Susan Millington Campbell, New York City, for The Secretary.

## OPINION

WERKER, District Judge.

These actions challenge the legality of regulations recently issued by the Secretary ("Secretary") of the Department of Health and Human Services ("HHS") that (1) require family planning services that receive federal funds pursuant to Title X of the Public Health Service Act, 42 U.S.C. §§ 300–300a–6a, to notify the parent or guardian of an unemancipated minor that prescription contraceptive drugs or devices have been provided to the minor and (2) revoke the prior authority given to Title X grantees to disregard family income when determining the fees to be charged to unemancipated minors who desire treatment on a confidential basis. 49 Fed.Reg. 3614. Plaintiffs moved by order to show cause on January 26, 1983 for a preliminary injunction enjoining the Secretary from enforcing the regulations, which are scheduled to go into effect on February 25, 1983. For the reasons that follow, the motions are granted.[1]

## FACTS

In 1970, Congress added Title X to the Public Health Service Act, Pub.L. No. 91–572, 84 Stat. 1504 (1970), which established a system of federally funding public and nonprofit private family planning projects. Congress' purpose in enacting Title X was to provide federal assistance in making family planning services available to all people. *Id.* at § 2(1), 84 Stat. 1504. Over the years, Congress consistently expressed concern with the difficulties of reaching adolescents who were in need of family planning services. *E.g.,* H.R.Rep. No. 1161, 93d Cong., 2d Sess. 14 (1974); S.Rep. No. 29, 94th Cong., 1st Sess. 55 (1975), U.S.Code Cong. & Admin.News 1975, p. 469; H.R. Rep. No. 192, 94th Cong., 1st Sess. 27 (1975). In 1978, Congress declared that "the prob-

lems of teenage pregnancy have become critical," H.R.Rep. No. 1191, 95th Cong., 2d Sess. 31 (1978), and therefore amended Title X to include a specific mandate that Title X grantees must provide services to adolescents. Pub.L. No. 95–613 § 1(a)(1), 92 Stat. 3093 (1978). See *id.* & S.Rep. No. 822, 95th Cong., 2d Sess. 24, 27–30 (1978) for a discussion of the harmful and costly health and social effects of teenage pregnancy.

In 1981, effecting "no substantial chang[e] in the existing law," H.R.Rep. No. 158, 97th Cong., 1st Sess. 73 (1981), Congress again amended Title X to read as follows:

> To the extent practical, entities which receive grants or contracts under [Title X] shall encourage family participation in projects assisted under [Title X].

42 U.S.C. § 300(a). The Joint Explanatory Statement of the Committee of Conference on the 1981 amendment states:

> The conferees believe that, while family involvement is not mandated, it is important that families participate in the activities authorized by this title as much as possible. It is the intent of the Conferees that grantees will encourage participants in Title X programs to include their families in counseling and involve them in decisions about services.

H.R.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 1161. It was pursuant to this amendment that the Secretary issued the regulations challenged here.

### The Regulations

Under the new regulations, when Title X grantees initially provide prescription drugs or devices to an unemancipated minor, they must notify a parent or guardian of the minor within ten working days. 49 Fed. Reg. 3614 § 59.5[a][12][i][A] (1983). Prior to servicing the minor, the grantee must inform the minor that such notice will be

---

1. A hearing was held on the motions on February 3, 1983 in order to give the parties an opportunity to present their evidence. At that hearing, however, only argument was heard, and no live testimony was presented. Nor have the parties requested an evidentiary hear-

ing. In light of this and the pleadings, the numerous affidavits and the documentary evidence submitted by plaintiffs, the court finds that no evidentiary hearing is required. *See Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 442 (2d Cir.1977).

given. *Id.* The regulations further require the grantee to verify receipt of the notice by "certified mail [with restricted delivery and return receipt requested], or other similar forms of documentation." *Id.* If the grantee is unable to verify receipt of the notice, it is prohibited from providing the minor with any additional prescription drugs or devices. *Id.* Notification need not be given when the grantee determines that it would result in physical harm to the minor by a parent or guardian, *id.* at § 59.5[a][12][i][B], or when prescription drugs are provided for the treatment of sexually transmitted diseases. *Id.* at § 59.-5[a][12][i][E]. The grantee must keep records on the notices sent and the verifications received and on the number of and factual basis for determinations not to give notice because of potential physical abuse. *Id.* at § 59.5[a][12][i][D]. These records must be made available to the Secretary upon request. *Id.* The regulations also delete the provision currently contained in 42 C.F.R. § 59.2, which states that "unemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources." 48 Fed.Reg. 3614 at § 59.2 (1983).

*The Parties*

The first action has been commenced by the State of New York ("State") and its department of health ("NYSDH"). These plaintiffs allege that the State has been awarded $8 million in Title X funds for the 1982–1983 fiscal year and that approximately $4.5 million of those funds will be distributed by NYSDH to various delegate agencies that provide family planning services. The second action has been brought as a class action by the Medical and Health Research Association of New York City, Inc. ("MHRA"), a private nonprofit corporation that was formed to assist in the development of health facilities in the City of New York, and two physicians. MHRA states that it has been awarded $2.1 million in Title X funds for the 1982–1983 fiscal year. According to MHRA, $754,149 of those funds will be distributed to MHRA's service divisions—the Maternity Infant-Care Family Planning Projects

("MIC/FPP") and the Project for Far Rockaway's Youth in Medical Essentials ("PRYME"). MHRA sues on behalf of MIC/FPP, PRYME and all other similarly situated family planning services in New York. The physician plaintiffs are Dr. Donna O'Hare, who is in charge of planning and implementing Title X-funded services at MIC/FPP, and Dr. Harvey Simon, who performs a similar function at PRYME. They sue on behalf of all similarly situated physicians and on behalf of their adolescent patients.

Plaintiffs claim that the Secretary's regulations will prevent adolescents who want confidentiality and/or to be charged on the basis of their own resources from making use of Title X clinics. They argue that the effect of the regulations will be to reverse the progress that has been made in the State in reaching adolescents who need family planning services and in decreasing the number of unwanted teenage pregnancies. According to plaintiffs, the regulations will defeat one of the main purposes of Congress in enacting Title X, that is, to make family planning services available to adolescents in order to stem the tide of unwanted adolescent pregnancy. In addition, plaintiffs claim that the regulations violate minors' constitutional rights to privacy and equal protection of the laws.

## DISCUSSION

*Standing to Sue*

Before addressing the validity of the regulations, the court must determine whether plaintiffs have standing to maintain these actions. The concept of standing encompasses both constitutional requirements and jurisprudential principles that insure that federal courts decide only "cases" or "controversies" as mandated by Article III. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The basic constitutional

requirement is that the plaintiff must demonstrate "injury in fact," that is, that he has sustained or is in immediate danger of sustaining injury as a result of the challenged conduct of the defendant. *E.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)); *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The plaintiff also must show that the injury " 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

■ One of the prudential doctrines that comes into play in the area of standing is the rule that the interests the plaintiff seeks to vindicate must be "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Another is the principle that the complaint must be based on the plaintiff's own rights, not those of third parties. *E.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). This second rule of prudence is not enforced strictly because there are special classes of cases "where its underlying justifications are absent." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976); *see, e.g., Carey v. Population Servs. Internat'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

■ The court finds that the State, NYSDH and the physician plaintiffs have standing to litigate these actions. The court therefore need not address the standing of MHRA, a private organization that receives and distributes Title X funds to family planning services in the City of New York. The State, NYSDH and the physician plaintiffs are in immediate danger of suffering unique and concrete injury as a result of the Secretary's regulations. The State and NYSDH have submitted well-documented proof that they and the citizens whose health and welfare they are charged with protecting are faced with the very real threat of having to cope with the adverse health and social consequences of increased unwanted adolescent pregnancy and the financial burdens of additional persons in need of public assistance. The physician plaintiffs claim that, to comply with the Secretary's regulations, will force them not only to violate their ethical and legal duty to maintain patient confidentiality but also to practice medicine contrary to the best interests of their patients. The complaints and the affidavits submitted demonstrate that these injuries are both "real and immediate," *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), and therefore are sufficient to lay the basis for standing.

Furthermore, there is no question that the State, NYSDH and the physician plaintiffs are within the zone of interests sought to be protected by Title X. As previously discussed, the purpose of Title X was to make family planning services available to all persons, and it is clear that Congress relied on the recipients of Title X funds to effectuate that purpose. Certainly, the State and NYSDH, as Title X grantees, and the physician plaintiffs, who are necessary to provide family planning services, are intended beneficiaries of Title X. *See Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972).

■ Since the physician plaintiffs also seek to assert the rights of their unemancipated minor patients, the court must decide whether the physicians are the proper pro-

ponents of those rights. In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Court held that, in challenging government limitations on funding abortions, it was entirely appropriate for physicians who performed abortions to litigate the rights of their female patients. *Id.* at 118, 96 S.Ct. at 2876. *Singleton* squarely controls this case, and for the reasons discussed therein, *id.* at 114–18, 96 S.Ct. at 2874–76, the physician plaintiffs may assert the rights of their unemancipated minor patients.

*Preliminary Injunctive Relief*

The standards for issuing a preliminary injunction are:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see, e.g., Standard & Poors Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 707 (2d Cir.1982); *Friarton Estates Corp. v. City of New York,* 681 F.2d 150, 152 n. 2 (2d Cir.1982); *Arrow United Indus., Inc. v. Hugh Richards, Inc.,* 678 F.2d 410, 413–14 (2d Cir.1982). The burden is on the party seeking the preliminary injunctive relief to establish these elements. *E.g., Standard & Poors Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 707 (2d Cir.1982).

*Irreparable Harm*

■ There is little doubt that plaintiffs will suffer irreparable harm from the operation of the Secretary's regulations. To begin with, plaintiffs have presented substantial statistical and medical documentation that a parental notice requirement will deter adolescents from obtaining prescription contraceptives and other family planning services. In the same fashion, they have shown that, even without the benefit of such services, adolescents will not abstain from sexual activity. From the foregoing, common sense dictates but one conclusion:

the deterrent effect of the regulations will cause increased adolescent pregnancies. Moreover, in refraining from frequenting family planning projects, many adolescents will not receive the diagnostic and preventive health care provided by these projects. As a result, many maladies, including venereal disease, will not be prevented, detected or treated. Plaintiffs overwhelmingly have demonstrated and numerous authorities agree that adolescent pregnancy is fraught with dangers to the health of both the young mother and her child. Similarly, adolescent pregnancies, particularly those that are unwanted, place tremendous social and economic burdens on the young mother, her family and society in general. The adverse health and social consequences of venereal disease are well-known. Thus, the adolescents on whose behalf the physician plaintiffs sue and the State and NYSDH, the protectors of the health and welfare of the citizens of the State, clearly are in serious risk of suffering irreparable harm.

The Secretary's contention that this is a case of "classic" speculative injury is fatuous. For example, he attempts to disprove the probability of the occurrence of these harms by arguing that adolescents remain free to obtain prescription contraceptives from private physicians and to use nonprescription methods of contraception. The realities are, however, that many if not most adolescents cannot afford the services of a private doctor and that nonprescription contraceptives are substantially less effective than prescription types. Furthermore, the Secretary cites to no studies and relies on no medical experts to support his position.

Plaintiffs are threatened with other irreparable injuries. As noted above, the regulations require Title X recipients to keep records on fulfilling the notice requirement and on granting the physical abuse exception, which records may be inspected by the Secretary upon request. 49 Fed. Reg. 3614 § 59.5[a][12][i][D]. Of course, once these records are made available to the Secretary, whatever rights the minors have to the confidentiality of such information will be destroyed. *See Advocates for Chil-*

*dren, Inc. v. Blum,* 529 F.Supp. 422, 423 (S.D.N.Y.1982). In addition, the physician plaintiffs claim that the parental notice and record disclosure requirements will force them to breach their ethical duty to maintain patient confidentiality. *Id.* Certainly, their reputation for trust among their adolescent clientele will be damaged severely, if not effaced. *See Standard & Poors Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982). Finally, and obviously, should the physician plaintiffs and/or the family planning projects that employ them elect not to comply with the regulations, Title X funding will be terminated and plaintiffs well may lose their jobs. *See Advocates for Children, Inc. v. Blum,* 529 F.Supp. 422, 423–24 (S.D.N.Y.1982).

*Likelihood of Success on the Merits*

The court now turns to the likelihood of plaintiffs' success on the merits. Since Congress has delegated to the Secretary the authority to promulgate regulations governing the granting of Title X funds, 42 U.S.C. § 300a–4(a), the regulations at issue here must be upheld if they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 706(2)(A). Although the Secretary argues that his decision must be given deference, his decision cannot stand if it is inconsistent with the intent of Congress or would defeat the purpose of the Title X program. *Batterton v. Francis,* 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). The court finds that, based upon the record before it, the regulations constitute a blatant disregard for one of the main purposes of Title X and, unless a trial on the merits discloses information that is drastically to the contrary, the regulations cannot be upheld.

The initial issue is whether the parental notice requirement is consistent with the intent and purpose of Congress in enacting Title X and its subsequent amendments. As noted previously, the 1978 amendment was passed to assure that Title X services are available to adolescents. Plaintiffs claim that the parental notice requirement would defeat that purpose because it will deter adolescents from frequenting Title X clinics. In support of their position that the parental notice requirement contravenes the congressional intent to reach adolescents, plaintiffs rely on numerous legislative reports and other relevant material. What is revealed by that material is discussed below.

Congress always has firmly believed that, when feasible, unemancipated minors should be encouraged through counseling to involve their parents or their families in their decision to use contraceptives. S.Rep. No. 29, 94th Cong., 1st Sess. 55 (1975); S.Rep. No. 822, 95th Cong., 2d Sess. 14, 63 (1978); H.R.Rep. No. 158, 97th Cong., 1st Sess. 82 (1981). Congress, however, also has recognized that adolescents' fear of their parents learning or being told about their requests for contraceptive services constitutes a significant barrier to reaching adolescents. S.Rep. No. 102, 95th Cong., 1st Sess. 26 (1977), U.S.Code Cong. & Admin. News 1977, p. 549; S.Rep. No. 822, 95th Cong., 2d Sess. 31 (1978).

In 1978, Representative Volkmer introduced an amendment to Title X that would have required Title X projects to notify the parent or guardian of an unemancipated child under the age of 16 before prescription drugs or devices were provided to the child. 124 Cong.Rec. 37,044 (1978). That amendment was defeated by a vote of 45 to 10. In opposing the amendment on the ground that it would deter minors from seeking family planning services, Representative Rogers stated:

I agree that family planning programs should encourage adolescents to discuss their sexual activities with their parents, but many simply will not come in if we require such a discussion. And what will happen to them? They risk becoming pregnant and we risk spending $4.5 billion a year in welfare costs for adolescent mothers and their dependent children.

*Id.* Hale Champion, at that time the Secretary of the Department of Health and Welfare,[2] disapproved of the amendment for the same reason. Plaintiffs' Appendix to Reply Memorandum of Law Exhibit 26.

After the Secretary had issued the regulations that are challenged in these actions, a hearing was held on those regulations before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce. Plaintiffs' Appendix to Reply Memorandum of Law Exhibit 23. At that hearing, Representative Waxman, who wrote the 1981 amendment, stated that the regulations constituted "a deliberate disregard of the laws passed by Congress and the clear congressional intent behind the family planning statute." *Id.* at 147. He further commented that the regulations posed

> a real barrier for many adolescents. The effect of [the] regulations would be to discourage an adolescent from coming into a clinic for counseling or contraceptive services and to set back the desired result of encouraging communication between the parent and the adolescent.
>
> Many teenage girls will simply not seek advice or assistance at all. The result will be more pregnancies among adolescents and more abortions.

*Id.* At the same hearing, Representative Scheuer, one of the original authors of Title X, stated that "the regulations not only go beyond, but blatantly contravene, congressional intent." *Id.* at 149.[3]

In the face of all of this, the Secretary contends that the parental notice requirement is perfectly consistent with the 1981 amendment's direction that Title X grantees "shall encourage family participation." 42 U.S.C. § 300(a). His argument

runs essentially as follows. First, he claims that Congress clearly gave him the authority to require parental notice because, if Congress intended to rely on the discretion of the grantee to determine how and when to encourage family involvement, the 1981 amendment would be a nullity. Second, he avers that parental notice is an appropriate method of encouraging parental participation because, without it, such participation is impossible. According to the Secretary, the notice requirement does not mandate family involvement, it just facilitates it. Finally, he contends that the parental notice requirement is limited to prescription contraceptives, an area where parental involvement is most needed because of the documented side-effects of the use of such contraceptives, and thus is reasonable.

The Secretary's argument is nothing more than an exercise in mere sophistry. To say that the parental notice requirement does not mandate, but merely facilitates, parental involvement is to make a distinction without a difference. Once a parent learns of his or her child's use of contraceptives, activity that obviously would be of serious concern to any parent,[4] there is no question that the parent is then involved. Yet the legislative history of the 1981 amendment is clear: parental or family participation is not mandated; rather, what is required is that Title X grantees encourage *their clients* to include their families in making decisions about family planning services. H.R.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981). There simply is no indication in the legislative history of the 1981 amendment that Congress in any way had deviated from its prior position that required parental notice was not a feasible method of promoting family involvement.

---

**2.** HHS formerly was the Department of Health Education and Welfare.

**3.** Indeed, in a memorandum to the Secretary, the General Counsel to HHS stated that the parental notice requirement easily could be subjected to legal challenge because it raised a barrier to access and thus could "be viewed as inconsistent with the 1978 amendment." Plaintiffs' Appendix to Memorandum of Law Exhibit 14 at 4.

**4.** A parent's right to participate in the decisions of his or her child to use contraceptives or to obtain other family planning services is not in issue in this case. The only issue is whether Congress intended that minors should be able to receive family planning services without being required to involve their parents. The legislative history clearly demonstrates that it did.

Surely, if congressional opinion had changed so significantly, one would have to presume that such a departure would have been expressed either in the statute or at least in the legislative history.

With respect to the Secretary's claim that the parental notice requirement has a rational basis because it is limited to the provision of prescription contraceptives, suffice it to say that, in 1978, Congress was well aware of the risks involved with the use of certain types of prescription contraceptives. S.Rep. No. 822, 95th Cong., 2d Sess. 33–37 (1978). In that same year, however, Congress rejected the Volkmer amendment that similarly was restricted to prescription contraceptives. 124 Cong.Rec. 37,044 (1978).[5] Moreover, diaphragms fall within the ambit of prescription contraceptives, yet the Secretary has identified no documented evidence of any adverse side-effects of the use of that device. In this respect, the Secretary's regulations are arbitrary and capricious.

The court therefore must conclude from the evidence presented that the parental notice requirement is invalid because it contradicts and subverts the intent of Congress.[6]

The next question to be resolved is the legality of the Secretary's decision to redefine "low-income family" to eliminate the prior authority that HHS had given to Title X grantees to charge unemancipated minors who wanted confidential treatment on the basis of the minors' own financial resources. Plaintiffs claim that this is another form of a parental notice requirement, and, in cases where the parent agrees to pay for the services, a parental consent requirement.

Plaintiffs also contend that the redefinition is vague and overbroad. The Secretary defends his decision by arguing that, under the prior regulations, most adolescents were guaranteed service without regard to family income and that this procedure discriminated against those who were truly in financial need. According to the Secretary, the new regulations simply are intended to correct this problem.

While the court is, in some respects, sympathetic with the Secretary's position, the statute states that any definition of low-income family promulgated by the Secretary must "insure that economic status shall not be a deterrent to participation in [Title X] programs." 42 U.S.C. § 300a–4(c). Clearly and, as the Secretary concedes, minors who come from non-poverty level families will be deterred from seeking services if the minor is to be charged on the basis of family income. Moreover, in order to obtain services, the minor will be required to ask his or her parents to pay for the services. This, of course, constitutes a parental notice requirement, which the court already has found to be illegal, and therefore cannot stand.

## CONCLUSION

Accordingly, the court finds that plaintiffs will suffer irreparable harm if the challenged regulations are permitted to go into effect and that they have established a very strong probability of succeeding on their claim that the regulations are contrary to the intent of Congress and would defeat one of the basic purposes of Title X. In view of the court's disposition of the statutory issue, it need not address the constitutional claims raised by plaintiffs.

5. The Secretary attempts to discredit the significance of Congress' rejection of the Volkmer amendment by arguing that (1) unlike the challenged regulations, the amendment required notice before prescription contraceptives were prescribed and contained no exceptions and (2) the rejection may have been premised upon the incorrect perception that the amendment required parental consent. Contrary to the Secretary's contentions, the debate on the amendment reveals no indication that Congress was concerned with the timing of the notice or that Congress misconstrued the plain meaning of

the amendment. See 124 Cong.Rec. 37,044 (1978).

6. Just as the Secretary himself cannot impose a parental notice requirement, he similarly cannot require Title X grantees to comply with any state laws that mandate parental notification. He certainly is prohibited from requiring compliance with any state parental consent laws. See Doe v. Pickett, 480 F.Supp. 1218 (S.D.W. Va.1979). Thus, section 59.5[a][12][ii] of the Secretary's regulations is equally invalid.

Thus, plaintiffs' motions for a preliminary injunction are granted, and the Secretary is enjoined from implementing or enforcing the regulations appearing in Fed. Reg. 3614 (1983) (to be codified at 42 C.F.R. §§ 59.2 & 59.5(a)(12)) pending a full trial on the merits. Since the preliminary injunction merely will preserve the status quo and not subject the Secretary to any damage, no injunction bond is required. In addition, any application for a stay of this order will be denied.

SO ORDERED.