The STATE OF NEW YORK and The New York State Department of Health, Plaintiffs-Appellees,

v.

Margaret HECKLER, Secretary of the United States Department of Health and Human Services, Defendant-Appellant.

MEDICAL AND HEALTH RESEARCH ASSOCIATION OF NEW YORK CITY, INC., etc., et al., Plaintiffs-Appellees,

v.

Margaret HECKLER, or her successor, Secretary of the Department of Health and Human Services, Defendant-Appellant.

Nos. 1318, 1531, Dockets 83–6073, 6075.

United States Court of Appeals, Second Circuit.

Argued May 27, 1983.

Decided Oct. 7, 1983.

Susan M. Campbell, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Peter C. Salerno, Asst. U.S. Atty., New York City, of counsel), for defendant-appellant.

Deborah Bachrach, Deputy Atty.-in-Chief, Public Advocacy Div., Office of the Atty. Gen. of the State of N.Y., New York City (Robert Abrams, Atty. Gen., State of N.Y., Alan D. Aviles, Asst. Atty. Gen., New York City, of counsel), for plaintiffs-appellees, State of N.Y.

Suzanne Lynn, American Civil Liberties Union, New York City, Janet Benshoof, Nan D. Hunter (Sarah Wunsch, Rhonda Copelon, Center for Constitutional Rights, New York City, Steven R. Shapiro, Madeline Kochen, New York Civil Liberties Union, New York City, of counsel), for plaintiffs-appellees, Medical and Health Research Ass'n of New York City, et al.

Maureen McLeod, Associate Counsel, Health and Hospitals Corp., New York City (Daniel E. Cohen, New York City, of counsel), for Health and Hospitals Corp., amicus curiae.

Paul M. Dodyk, New York City (Cravath, Swaine & Moore, New York City, Ruth J. Katz, Washington, D.C., of counsel), for United States Congressman Henry A. Waxman, amicus curiae.

Patricia Hennessey, Civil Liberties & Public Policy Program, Hampshire College, Amherst, Mass. (Judith Levin, New York City, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City), for the American Public Health Ass'n, et al., amicus curiae.

Frank Tuplin, Deputy Atty. Gen. of the State of Pa., Pittsburgh, Pa., LeRoy S. Zimmerman, Atty. Gen. of the State of Pa., Philadelphia, Pa. (Jim Mattox, Atty. Gen. of the State of Tex., Mary Keller, Asst. Atty. Gen. of the State of Tex., Austin, Tex., of counsel), for States of Pa., Tex., Alaska, Colo., Conn., Del., Haw., Ia., Mont., N.M., N.J., Vt., W.Va., Wis. and Wyo., amici curiae.

Before FEINBERG, Chief Judge, FRIENDLY and WINTER, Circuit Judges.

FEINBERG, Chief Judge:

The Secretary of the Department of Health and Human Services (the Secretary) appeals from a judgment of the United States District Court for the Southern District of New York, Henry F. Werker, J., granting plaintiffs a permanent injunction against implementation of the Secretary's rules promulgated pursuant to Title X of the Public Health Service Act, 42 U.S.C. §§ 300 et seq. The rules in question are described in detail below. The most controversial of them, the so-called "squeal rule," requires Title X grantees to notify a parent of an unemancipated minor within ten days after the grantee has provided prescription contraceptives to the minor that the services have been provided. For reasons set forth below, we affirm the judgment of the district court in part, and we reverse in part.

I.

The relevant facts may be briefly stated: In 1970, Congress added Title X to the Public Health Service Act, 42 U.S.C. §§ 300 et seq., establishing a system of federally funded public and nonprofit private family planning projects. A stated purpose of the Title was "to assist in making comprehensive voluntary family planning services readily available to all persons desiring such services. . . ." Pub.L. No. 91–572, § 2(1). Title X has been amended and refunded several times. In 1978, noting that "the problems of teenage pregnancy have become critical," H.R.Rep. No. 1191, 95th Cong., 2d Sess. 31 (1978), Congress amended Title X specifically to include coverage for "services for adolescents."

In 1981, Congress added the following language to Title X: "To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection." 42 U.S.C. § 300(a).[1] Pursuant to this amendment, the Secretary

---

1. 42 U.S.C. § 300(a) (Supp. V 1981) currently reads:

§ 300. Project grants and contracts for family planning services

Authority of Secretary

(a) The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the

promulgated the regulations here at issue, to become effective on February 25, 1983. The sole reason asserted by the Secretary for the promulgation of these regulations was the necessity to implement the 1981 amendment to Title X directing grantees to encourage family participation in projects funded by that title. 48 Fed.Reg. 3600, 3601 (1983) (to be codified at 42 C.F.R. Part 59).

The most important change effected by the regulations, which are reproduced in the margin,[2] is the requirement that when prescription drugs or devices are initially provided by a project to an unemancipated minor, the project must within ten working days notify the minor's parent or guardian that the services have been provided. See 42 C.F.R. § 59.5(a)(12)(i)(A). The minor must be informed of the necessity of notification before the provision of these services, and receipt of notification by the parent or guardian must be verified. See id. In addition, the grantee must retain records of all notifications and determinations not to notify, which are to be available to the Secretary upon request. See id. at § 59.5(a)(12)(i)(D). There are two exceptions to the requirement to notify: If the project director or designated clinic head determines that notification will result in physical harm to the minor by the parent or guardian, id. at § 59.5(a)(12)(i)(B), or if services are provided for the treatment of a sexually transmitted disease, id. at § 59.-5(a)(12)(i)(E).

The new rules provide for two other changes. The first requires Title X

---

establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.

2. The regulations challenged by plaintiffs, 48 Fed.Reg. 3600, 3614 (1983) (to be codified at 42 C.F.R. §§ 59.2 & 59.5), are as follows:

§ 59.2 [Amended]

1. The last sentence of the definition of "low income family" in 42 CFR 59.2 is revoked and removed.

2. 42 CFR 59.5 is amended by adding thereto the following paragraph (a)(12) to read as follows:

§ 59.5 What requirements must be met by a family planning project?

(a) * * *

(12) Encourage, to the extent practical, family participation in the provision of the project's services to unemancipated minors. Notwithstanding any other requirement of this subpart, a project shall,

(i)(A) When prescription drugs or prescription devices are initially provided by the project to an unemancipated minor, notify a parent or guardian that they were provided, within 10 working days following their provision. The project must tell the minor prior to the provision of services about this notification requirement. As used in this subsection, the phrase "parent or guardian" shall refer to a parent or guardian residing with the minor or otherwise exercising ordinary parental functions with respect to the minor. The project shall verify by certified mail (with restricted delivery and return receipt requested), or other similar form of documentation, that the notification has been received. Where the project is unable to verify that notification was received, the project shall not provide additional prescription drugs or devices to the minor.

(B) A project is not required to comply with paragraph (a)(12)(i)(A) of this section where the project director or clinic head (when specifically so designated by the project director) determines that notification will result in physical harm to the minor by a parent or guardian.

(C) For the purposes of this paragraph (a)(12)(i), an "unemancipated minor" is an individual who is age 17 or under and is not, with respect to factors other than age, emancipated under State law.

(D) The project must keep records of notifications provided pursuant to the first sentence of paragraph (a)(12)(i)(A), and of verification that those notifications were received. The project must also keep records of the number of determinations made under paragraph (a)(12)(i)(B) and the factual basis for such determinations. The project must make records required by this subparagraph available to the Secretary on request.

(E) This paragraph (a)(12)(i) does not apply where prescription drugs are provided for the treatment of sexually transmitted diseases.

(ii) Where State law requires the notification or consent of a parent or guardian to the provision of family planning services to an individual who is an unemancipated minor under State law, provide such services only in the compliance with such law.

grantees to comply with state laws requiring parental notice or consent with respect to the provision of family planning services to a minor. See 42 C.F.R. § 59.-5(a)(12)(i)(E)(ii). The other change is the deletion from 42 C.F.R. § 59.2 of a provision added in 1980, 45 Fed.Reg. 37,436 (1980), that in defining "low income family," an unemancipated minor wishing to receive services on a confidential basis must be considered on the basis of his or her own resources.

On January 26, 1983, two separate actions challenging the legality of the new regulations were filed in the Southern District of New York. Plaintiffs in the first action were the State of New York and its Department of Health (NYSDH). Plaintiffs in the second action included a class of physicians and a private nonprofit corporation formed to assist in developing health facilities in New York City suing on behalf of two of its service divisions and other providers similarly situated. Following oral argument in both cases, Judge Werker denied the Secretary's motion to transfer the cases to the District of Columbia where a similar suit was pending or to stay the New York cases pending disposition in the District of Columbia. On February 14, 1983, following a determination that plaintiffs New York State, NYSDH and the physicians had standing to contest the regulations, Judge Werker preliminarily enjoined their implementation, finding that plaintiffs had demonstrated both irreparable harm and a likelihood of success on the merits. 557 F.Supp. 354.

On the issue of irreparable harm, Judge Werker found, among other things, that plaintiffs had shown that "the deterrent effect of the regulations will cause increased adolescent pregnancies ... [which are] fraught with dangers to the health of both the young mother and her child" and place great socio-economic burdens on the young mother, her family and society at large. See id. at 359. In addition, the court found irreparable harm in the breaching of confidentiality required by adherence to the regulations, and the loss of funding and jobs by Title X grantees that decided not to comply with the regulations. Id. at 359–60. As to likelihood of success on the merits, the court found that the parental notification requirement was illegal since "it contradicts and subverts the intent of Congress," id. at 362, as indicated by Title X and its legislative history. In particular, Judge Werker cited the Conference Committee report on the 1981 amendment, which stated:

> The conferees believe that, while family involvement is not mandated, it is important that families participate in the activities authorized by this Title as much as possible. It is the intent of the Conferees that grantees will encourage participants in Title X programs to include their families in counseling and involve them in decisions about services.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 799, reprinted in 1981 U.S.Code Cong. & Ad.News 1010, 1161 (Conference Report).

The district court also concluded that the Secretary's redefinition of "low income family" constituted a de facto notice requirement, and it too was therefore held illegal. 557 F.Supp. at 362. Finally, the court found invalid the regulation mandating compliance with state law that required parental notice or consent since the Secretary could not render state law applicable when contrary federal legislation clearly preempts the field. Id. at 362 n. 6, citing *Doe v. Pickett,* 480 F.Supp. 1218 (S.D.W.Va. 1979).[3]

---

**3.** In granting a preliminary injunction, Judge Werker also held that since diaphragms are within the ambit of prescription drugs and there was no evidence before the Secretary of adverse side effects from the use of diaphragms, the regulations were "arbitrary and capricious." 557 F.Supp. at 362. In his ruling on the motion for summary judgment, however, Judge Werker stated that the only issue presented was whether "the regulations are consistent with the intent of Congress as expressed in the language of Title X and its legislative history." In view of the disposition of this appeal, it is unnecessary for us to reach the issues of whether the regulations are arbitrary and capricious, or violate plaintiffs' constitu-

Shortly after the preliminary injunction issued, both sides moved for summary judgment. On March 7, 1983, Judge Werker granted plaintiffs' motion for summary judgment and permanently enjoined the Secretary from implementing the regulations. From this judgment, the Secretary appeals.

A few days after Judge Werker had issued his preliminary injunction in New York, the United States District Court for the District of Columbia enjoined the Secretary from implementing or enforcing the regulations. *Planned Parenthood Federation of America, Inc. v. Schweiker,* 559 F.Supp. 658 (D.D.C.).[4] The appeal from that order was heard on May 9, 1983. On July 8, 1983, in an opinion by Judge Wright, the United States Court of Appeals for the District of Columbia affirmed the judgment of the district court, *Planned Parenthood Federation of America, Inc. v. Schweiker,* 712 F.2d 650 (D.C.Cir.1983), with Judge Bork concurring in part and dissenting in part.

## II.

At the outset, we should deal with the Secretary's contention that none of the plaintiffs has standing to maintain these actions. The Secretary argues that plaintiffs have not suffered present or imminent "injury in fact," are not within the "zone of interests" protected by Title X, and may not assert third-party standing on behalf of their adolescent patients and clients. We believe, however, that at least New York State, NYSDH and the physician plaintiffs have standing to litigate the regulations requiring notice to parents, and redefining "low income family." While New York State and NYSDH may not have a right to receive grants under Title X, to the extent that funds are dispensed with allegedly unlawful conditions attached, these plaintiffs are injured and have standing to contest the conditions. See *Maher v. Roe,* 432 U.S. 464, 469–70, 97 S.Ct. 2376, 2380–81, 53 L.Ed.2d 484 (1977). So too, the physicians face real and immediate injury by complying with the notification regulation since they may thereby violate an ethical and legal duty to maintain confidentiality. Similarly, all of these plaintiffs, since they receive grants under Title X and are necessary to effectuate the purposes of Title X, are clearly within the zone of interests protected by that title, see *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972).[5] Finally, we believe, as did the district judge, that *Singleton v. Wulff,* 428 U.S. 106, 113–18, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976), allows physicians to assert the interests of the unemancipated minors.[6]

tional rights to privacy or equal protection, contentions that they press.

4. The District of Columbia suit expressly excluded from class coverage any class member who had already filed a suit in any court. 559 F.Supp. at 670.

5. Plaintiff New York State alleged that $8,000,000 in Title X funds for the 1982–83 fiscal year was "earmarked for distribution" to New York State grantees, of which approximately $4,500,000 was to be distributed by plaintiff NYSDH to delegate agencies providing family planning services. New York State also alleged that out of well over 100,000 girls under 18 years of age, who became pregnant from January 1978 to December 1981, approximately 60% had miscarriages or abortions. Of those pregnancies that resulted in childbirth, some 80% were out of wedlock.

6. Judge Friendly's separate opinion suggests that we do not have a case or controversy before us because the Secretary is already bound by an injunction entered in the District Court for the District of Columbia. Although we agree with our colleague that it would have been better if Judge Werker held granted the Secretary's motion to transfer or for a stay, we do not agree that there is no case or controversy here. Plaintiffs in the suit before us are not parties to the litigation in the District of Columbia; indeed, they were specifically excepted from the nationwide class there certified. Also, plaintiffs in this suit actually obtained injunctive relief against the Secretary in the Southern District before she was enjoined in the District of Columbia, even though the complaint there was filed first. Under all of these circumstances, we do not see why plaintiffs' case or controversy with the Secretary suddenly disappeared because, as our colleague assumes, they could seek "to put [the Secretary] in contempt" in another forum, which they did not choose.

■ We reach a contrary conclusion regarding the standing of plaintiffs to contest the regulation requiring grantee compliance with state law on parental notice or consent. Unlike the situation in *Planned Parenthood Federation of America, Inc. v. Schweiker,* supra, there is no nationwide class of plaintiffs before us. Therefore, we do not see how any of the plaintiffs face injury from this regulation since neither New York nor any bordering state has such a law. Accordingly, since the injury caused by this regulation is purely speculative and hypothetical at this time, the district court should not have reached the merits of plaintiffs' claim regarding it. We therefore find it necessary to reverse that portion of the judgment that enjoins the operation of this regulation. See *Warth v. Seldin,* 422 U.S. 490, 499–501, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975).

## III.

Turning then to the merits of the controversy properly before us, the Secretary first argues that the 1981 amendment and its legislative history are, at best, inconclusive on the issue of notification and that, therefore, we should simply defer to the Secretary's statutory prerogative to administer Title X programs by appropriate regulations. The Secretary contends that in implementing the 1981 amendment to Title X, she was merely choosing among four possible ways of having grantees encourage family involvement. Thus, grantees could be required (1) to suggest to minors that they involve their parents; or (2) to notify parents that a minor is seeking Title X contraceptive services; or (3) to secure parental consent prior to dispensing contraceptives to minors; or (4) to confer with the minor and her family prior to dispensing contraceptives. In choosing the second alternative, the Secretary argues, she is merely balancing the congressional policy of encouraging family involvement with the policy of preventing teenage pregnancies. The Secretary also asserts that notification does not compel family involvement but

merely provides an opportunity for such involvement.

■ We are unpersuaded by these arguments. We agree with Judge Werker and the Court of Appeals for the District of Columbia Circuit that the 1981 amendment to Title X did not authorize the regulations regarding mandatory notification and redefining "low income family." Congress did not intend to require parental involvement but merely meant to encourage it; the encouragement is clearly to be directed at minors to involve their parents or guardians and it was not intended that grantees directly involve parents or guardians. See 42 U.S.C. § 300(a) ("encourage family participation"); Conference Report, supra at 799, U.S.Code Cong. & Ad.News at 1161 ("family involvement is not mandated.... It is the intent of the Conferees that grantees will encourage participants...."). Finally, we agree with Judge Werker that the Secretary's argument that the regulation requiring that parents be notified does not mandate their involvement, but merely provides the opportunity for it, "is ... a distinction without a difference." 557 F.Supp. at 361. Once a parent is notified that a child is seeking contraceptive services, the parent is surely involved.

The Secretary also argues to us, although she did not do so in the district court, that Title XX of the Public Health Service Act, entitled Adolescent Family Life Demonstration Projects,[7] is relevant to interpreting Title X since the Secretary, under Title XX, is charged with the coordination of "Federal policies and programs providing services relating to the prevention of adolescent sexual relations and initial and recurrent adolescent pregnancies and providing care services for pregnant adolescents." 42 U.S.C. § 300z–6(a). In particular, the Secretary points to a mandate to review all programs sponsored by the Department relating to prevention and care services to determine if such programs are consistent with the policies of Title XX. 42 U.S.C. § 300z–6(a)(3). Under Title XX, grantees are required to

---

7. 42 U.S.C. § 300z et seq. (Supp. V 1981).

notify parents and receive parental consent before providing services under that Title. 42 U.S.C. § 300z–5(a)(22)(A)(i) & (ii).

The District of Columbia Circuit dealt extensively with this argument and we need not discuss it at length. We merely offer two observations. Title XX and the 1981 amendment to Title X were enacted at the same time, yet the former specifically included a requirement for parental notification and consent while the latter did not. Obviously, Congress knew how to require parental notice and consent when that was its intention. Moreover, Title XX is a small, experimental program providing for "demonstration projects," authorizing $30,-000,000 for the fiscal years ending September 1982–84.[8] Title X, on the other hand, with increasing appropriations of over $125,000,000 to $150,830,000 for the same time period,[9] has been the cornerstone in our nation's effort to curb adolescent pregnancy and promote family planning. Logic would suggest that the explicit requirement of a demonstration project not be read by implication into a mainstream program.

With respect to the Secretary's redefinition of "low income family," the Secretary contends that the redefinition merely carries out a congressional policy of Title X that priority be given to "furnishing . . . services for persons from low income families." 42 U.S.C. § 300a–4(c)(1). Even though this language had been in the statute for some time, in 1980 the Secretary added the requirement that minors be considered on the basis of their own resources "particularly in light of the recent statutory inclusion of specific language mandating services for adolescents." 45 Fed.Reg. 37,433, 37,434 (1980). Yet, in 1981, the Secretary changed the regulation, relying, in part, on the language quoted above that priority be given to persons from low income families. But we find nothing in the legislative history of Title X to justify the view that Congress had changed its policies from 1980 to 1981 regarding the provisions of services to adolescents. Moreover, given the invalidity of the notification regulation, the redefinition of "low income family" operates as a de facto notice requirement, bringing about the very results contemplated by the invalidated regulation. We believe the analysis of the Secretary's authority to issue the former also applies to the latter and it too is invalid.

Because the Secretary promulgated these regulations solely in order to implement the 1981 amendment to Title X, we need not reach questions relating to the power of the Secretary to promulgate these or similar regulations pursuant to some other statutory authority.

Accordingly, we affirm the judgment of the district court except for that portion invalidating and enjoining the regulation that requires compliance with state law. As to that portion of the judgment, we reverse with instructions to dismiss so much of the complaint as raises the claim.

FRIENDLY, Circuit Judge, concurring and dissenting:

I am at a loss to understand what it is thought we are accomplishing by deciding this appeal or how we may properly do so. The United States Department of Health and Human Services and the Secretary were permanently enjoined by the District Court for the District of Columbia on March 2, 1983, from implementing or enforcing the challenged regulations, *Planned Parenthood Federation of America v. Schweiker,* 559 F.Supp. 658 (D.D.C.1983). The injunction was affirmed on July 8, 1983, by the Court of Appeals for that circuit, 712 F.2d 650, 665. By agreeing with the majority of the Court of Appeals, we add no protection to what plaintiffs already have;[1] had we disagreed, we could have

---

**8.** Pub.L. 97–35 § 2010(a), 95 Stat. 591 (1981).

**9.** Pub.L. No. 97–35 § 931(a)(1), 95 Stat. 570 (1981).

**1.** Any argument that the plaintiffs require a second injunction because of the possibility

that the parties to the District of Columbia actions might agree to have the injunction vacated or that the court might modify it so that it would not protect the plaintiffs here would be utterly unrealistic. Plaintiffs likewise have no need for an injunction in the Southern Dis-

subtracted nothing. The only way by which the Secretary can escape the force of the injunction issued in the District of Columbia is by obtaining a grant of certiorari and reversal by the Supreme Court. What we are doing is simply rendering an advisory opinion whether or not we agree with the District of Columbia Circuit—an opinion which can have no legal consequence to any of the parties. Under these circumstances I do not perceive the existence of the case or controversy required by Article III.

In these days of crowded dockets, federal courts have a particular responsibility to avoid duplicative litigation. This is especially true when the suits seek injunctions against the head of a Government Department because of an issue of law having nationwide effect. Here, in addition to the actions in the District of Columbia and the Southern District of New York, suits seeking annulment of the regulation on the same grounds were filed in the Southern District of West Virginia and the Western District of Tennessee. In the latter a preliminary injunction was issued on February 24, 1983; later a stay was granted pending resolution of the actions in the District of Columbia. This was a situation that cried for exercise by the district courts of the powers of stay, transfer or, if necessary, injunction against proceedings in another court, in order to avoid waste of judicial resources. See Hart & Wechsler, The Federal Courts and the Federal System 1232–34 (2d ed. 1973); *Penn-Central Merger Cases,* 389 U.S. 486, 496–97 & n. 2, 88 S.Ct. 602, 607–08 & n. 2, 19 L.Ed.2d 723 (1968); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1201–04 (2 Cir.1970); *M/V Theresa Ann v. Kreps,* 548 F.2d 1382, 1383 (9 Cir.1977); *Private Medical Care Foundation, Inc. v. Califano,* 451 F.Supp. 450, 452–53 (W.D.Okl.1977); *Hoetzer v. County of Erie,* 497 F.Supp. 1207, 1210 (W.D.N.Y. 1980); *New York State Teamsters Fund v. Hoh,* 554 F.Supp. 519, 529 (N.D.N.Y.1982). I can see no reason why the district court should not have granted the Secretary's mo-

tion for transfer or, preferably, for a stay, which could have been conditioned on the prompt hearing and decision of the application for an injunction in the District Court for the District of Columbia and could have provided for dissolution if the District of Columbia court denied injunctive relief. The waste of duplicate briefing, argument, decision making, and opinion writing in the Southern District of New York and in this court could thus have been avoided.

In view of my belief that the case is no longer properly before us, I shall comment on the merits only briefly. If we were to look only to the language of 42 U.S.C. § 300(a), I would find it impossible to conclude that the broad rulemaking authority conferred on the Secretary by 42 U.S.C. § 300a–4(a), see *Heckler v. Campbell,* —— U.S. ——, ——, 103 S.Ct. 1952, 1956, 76 L.Ed.2d 66 (1983), did not authorize what the Secretary could reasonably deem the most effective form of encouraging family participation, namely, notification. I cannot accept appellees' argument that authority to require notification was precluded by the introductory phrase "To the extent practical". This means, or could reasonably be read by the Secretary to mean, that the Secretary was not required to do the impractical—not that the courts were authorized to prevent action which the Secretary determined would be practical. While the notice language in Title XX, 42 U.S.C. § 300z–5(a)(22)(A)(i), shows, as Judge Wright put it for the majority in the District of Columbia Circuit, that "Congress knew very well how to write a statute that mandates parental notification," 712 F.2d at 656 n. 30, this proves only that the sentence added to 42 U.S.C. § 300(a) did not oblige the Secretary to require notice—a proposition on which all agree. To the extent that the Court of Appeals for the District of Columbia Circuit and this court hold that the regulation was invalid as running counter to the statutory text, I respectfully disagree.

The question, however, is not what the statute says but what it means. Here we

trict in order to be able to put the defendants in contempt; they could obtain that relief in the District of Columbia in the remote event that

defendants violated the injunction issued there even though plaintiffs are not parties in that case.

must confront the rather different language of the Conference Report, H.R.Conf. Rep. No. 208, 97th Cong., 1st Sess. 799 (1981), reprinted in 1981 U.S.Cong. & Ad. News 1161. While the statute places the burden of encouraging family participation on the grantees of federal assistance without limiting the methods which the Secretary by regulation may use to get them to do so, the Conference Report characterizes the intent of the conferees as being "that grantees will encourage participants in Title X programs to include their families in counseling and involve them in decisions about services." Id. at 1161 (Emphasis supplied). If this is what the 1981 amendment means, the notice regulation goes beyond it.

Normally one would suppose that courts should follow the words that Congress enacted rather than what even such an important indicator of legislative intent as a conference report said it meant to enact. To do otherwise risks the danger that a minority unable to achieve enactment of its views may accomplish that end by having its desired wording inserted in a conference report. Adherence to the text might seem particularly desirable in the light of what Judge Wright called recent "ritualistic incantations" of the "plain meaning" rule by the Supreme Court, 712 F.2d at 657 n. 32. See, e.g., Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 3245 (1982), citing Caminetti v. United States, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917), and Central Trust Co. v. Creditors' Committee, 454 U.S. 354, 359–60, 102 S.Ct. 695, 696–97, 70 L.Ed.2d 542 (1982) (per curiam) (also quoting Caminetti, supra, 242 U.S. at 485, 37 S.Ct. at 194). However, a colleague of Judge Wright's has observed—I would hope correctly—that "The language of 'plain meaning' lingers on in Court opinions, but its spirit is gone." Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 197–98 (1983). See, in contrast to Griffin, FBI v. Abramson, 456 U.S. 615, 625, 102 S.Ct. 2054, 2061, 72 L.Ed.2d 376 n. 7 (1982), quoting from Justice Frankfurter's dissent in United States v. Monia, 317 U.S.

424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943), and Bob Jones University v. United States, —— U.S. ——, ——, 103 S.Ct. 2017, 2024, 76 L.Ed.2d 157 (1983). Here there is enough legislative material in addition to the Conference Report to justify the conclusion that the sentence added to § 300(a) in 1981 means no more than the Conference Report says, and that the notification regulation, which was based entirely on the authority of that sentence, thus goes beyond even the Secretary's wide rulemaking authority. Resort to such legislative materials is especially appropriate when, as here, there is no danger that private citizens may have relied to their detriment on the statutory words. Whether, as Judge Bork questioned in the District of Columbia case, 712 F.2d at 665–68, the Secretary might have authority to promulgate regulations similar to those here challenged quite apart from the added sentence is not before us and may never be.

Hence, if we reach the merits, as I would not, I join in the majority's disposition, although not in its opinion.