CITY OF NEW YORK, et al., Plaintiffs,

v.

Margaret M. HECKLER, As Secretary of HHS, et al., Defendants.

No. CV–83–0457.

United States District Court,
E.D. New York.

Jan. 11, 1984.

Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York by Thomas W. Bergdall, Lois M. May, Asst. Corp. Coun-

sels, Robert Abrams, Atty. Gen. of the State of N.Y. by Paul M. Glickman, Howard L. Zwickel, Asst. Attys. Gen., Rosenman, Colin, Freund, Lewis & Cohen by Ambrose Doskow, Jan G. Zager, New York City, Leonard S. Rubenstein, Mental Health Law Project, Washington, D.C., for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Reuben S. Koolyk, Asst. U.S. Atty., Brooklyn, N.Y., Annette H. Blum, Regional Atty., Region II, Dept. of Health and Human Services, New York City, by Gail N. Mancher, New York City, for defendants.

## PARTIAL GLOSSARY

1. POM's—SSA's Program Operations Manual Systems
2. QED Form—SSA's Psychiatric Review Form
3. RFC—Residual Functional Capacity
4. SSA—Social Security Administration
5. SSD—Social Security Disability
6. SSI—Supplemental Security Income
7. State ODD—New York State Office of Disability Determinations

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

This case raises difficult issues respecting protection of the rights of claimants by the bureaucracy charged with dispensing social security disability and supplemental security income benefits. Courts assume that professionals such as doctors, lawyers and managers responsible for important government institutions will enforce the law with scrupulous impartiality and concern for the rights of their clients—here those claiming disability. That presumption of legality has been rebutted by evidence of denial of the rights of disabled persons acquiesced in by the professionals charged with assisting them. The result was particularly tragic in the instant case because of its devastating effect on thousands of mentally ill persons whose very disability prevented them from effectively confronting the system. To understand what happened and why we must describe how the system is designed and why it failed.

## I. Facts

### A. Statute and Regulations

The federal government provides disabled persons benefits through the Social Security Disability Insurance Program (SSD) and the Supplemental Security Income Program (SSI). Under both statutes, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

By regulation the Secretary has adopted a five-step "sequential evaluation" process to determine whether individuals—both applicants and recipients—are eligible for benefits. The process is essentially the same for both SSD and SSI claimants.

At the first step, if the person is presently engaged in substantial gainful activity, he or she is disqualified from receiving benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a).

At the second step, the Secretary must determine whether the claimant's condition is severe. If not, benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If the impairment is severe, the Secretary as a third step determines whether or not the applicant meets or equals the listings of impairments set forth in the Social Security regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). The listings contain

*per se* disabling impairments. If a person meets or equals the listings, he or she is entitled to benefits.

If the claimant does not meet or equal the· listings, the fourth step requires an assessment of the individual's residual functional capacity (RFC) and a determination of whether that capacity enables the individual to meet the demands of the work he or she performed in the past. If it does, the individual will not be entitled to benefits. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Even if the claimant cannot perform his or her past work, the fifth step calls for a determination of whether he or she can perform work available through jobs in significant numbers in the national economy. This assessment is made in light of the claimant's residual functional capacity, age, education and work experience. A determination of entitlement to benefits at this point is known as a "medical-vocational allowance." 20 C.F.R. §§ 404.1520(f), 416.-920(f).

### B. Administrative Review Process

All initial disability decisions are made by the New York State Office of Disability Determinations (State ODD) pursuant to a contract between the State and the Social Security Administration (SSA). The case record on any claim or review is compiled by a lay disability analyst who gathers information from the claimant and his or her treating physicians, social workers, and family members. Where such information is insufficient, the disability analyst is responsible for procuring one or more consultative examinations from a contacting psychiatrist or psychologist. The consulting doctor prepares a report of mental status following State ODD's instructions.

The actual psychiatric assessment of a claimant is then made on the basis of a review of the file by a staff physician employed by State ODD. The review physician is directed to use SSA's Psychiatric Review Form (or "QED" form, as it is often referred to within SSA and its agencies) to record his or her findings on a numerical basis. In theory, that form is designed to record the results of analysis of various psychiatric examinations. Space is provided for assignment of a numerical rating to each of 17 component items in three major areas in order to formulate a total "Psychiatric Impairment Rating" on a five point scale, "one" being normal and "five" a condition which compels a finding that the Listings are met. *See* SSA's Program Operations Manual System ("POMS") section 2211. Ratings of three and four are specifically defined to indicate severe mental illness which nevertheless does not meet or equal the listings of impairments.

Where the ratings on the QED form are three or four, regulations require that the review physician also assess the individual claimant's residual functional capacity. Before late 1982, SSA had no formal requirements or forms by which to make this measurement. To date no instructions have been promulgated indicating how this assessment is to be made. A form was provided by SSA in late 1982, however, on which the physician is directed to indicate whether the claimant has "limited" or "unlimited" abilities to sustain seven separate mental activities such as "understand ... job instructions," "interact with supervisors and co-workers," and "maintain concentration and attention." Where the evidence from the mental status examination and other data are inconclusive, instructions from the SSA Central Office have recognized that a full-scale "workshop evaluation" of the claimant's actual work abilities in a simulated work or work-like setting may prove helpful.

The physician's RFC assessment is then referred back to a disability analyst or specialist, a State ODD employee. After considering the claimant's RFC, age, experience, and education, this person decides whether the claimant can return to his former work or engage in any substantial gainful activity.

All decisions by the State ODD are subject to a "Quality Assurance Review" by the Regional and Central Offices of SSA. At the Regional level (Tier II), reviews are conducted by the region's analysts and phy-

sicians who have power to reverse any State ODD determination. In order to conduct the quality assurance assessment, SSA officials have conducted sample reviews of State ODD determinations on a sufficient basis to ensure, with what they contend is 95% accuracy, that the uniform policies of the Social Security Administration are being followed by the states.

The same oversight function is performed on a higher level by the Central Office of SSA in Baltimore, Maryland to review regional performance (Tier III review). Where either Tier II or Tier III review indicates an "error," the case is returned. The returns function much like remands do in the court system, and create "precedents" for determining future cases. Thus the returns from Baltimore form the basis of the Region's and State's own quality assurance reviews and instructions to physicians, disability examiners and specialists. There is a strong incentive to conform to Baltimore's central office policy as evidenced in the returns because quite serious consequences to the careers and bureaucratic standing of individuals may follow to those persisting in "mistakes." The Social Security Administration's ultimate sanction would be to remove the entire disability program from the control of the state, resulting in the loss of hundreds of state government jobs.

The significance of Tier II and Tier III review within the Social Security disability system can hardly be overstated. Marvin Lachman, Director of the New York State ODD's Bureau of Quality Assurance and Planning, testified that both categories of reviews are carefully analyzed by the State agency, and then used extensively for the preparation of both training and informational materials. Dr. Anne Geller, Chief Consulting Psychiatrist within SSA's Regional Office, similarly testified that Tier III reviews from Baltimore are both analyzed and followed in order to avoid the issuance of bureaucratic "demerits" within the system. Dr. Geller conceded that the standards reflected in these reviews constitute the best sources of guidance for the determination of future disability claims.

A large number of returns from a higher level causes the region and state administrations to pressure the review physicians to conform to the line from Baltimore.

C. Plaintiff Class

The class is defined as:

All individuals residing in the State of New York who have applied for or received Title II and/or Title XVI benefits on or after April 1, 1980, and who have been found by defendants to have a mental impairment which is severe (i.e., determined under 20 CFR § 404.1520(c) or § 416.930(c) to require evaluation under Appendix 1 of that Regulation), and whose applications for benefits have been or will be denied or whose benefits have been or will be terminated, on the basis of defendants' determination that such persons are capable of substantial gainful activity.

The class members suffer from severe mental illness. Its most common form is schizophrenia. In her testimony, Dr. Beatrice Braun, founder and director of a preventative treatment unit for the chronic mentally ill, described her typical patient:

In this program, [the] typical patient would probably be a young, in their 20's or 30's, male patient. Because we have a long waiting list, we try to pick the patients who are most severely ill and who but for being in a day program would probably be in a state hospital. So we have the more severe group.

These patients are usually quite well educated. Most are high school graduates. Some are college graduates and some have had some graduate school before the onset of this illness. So often their illness has had its onset in college and they'll be hospitalized and recover from the first acute episode perhaps return to college. Not functioning quite as well as they did before. Break down again and be hospitalized and maybe leave college and get a job for a brief period and jump around from one job to the other in and out of the hospital and gradually deterio-

rate until they need this kind of programming.

Despite the fact that many suffering from mental illness are well educated and may even have been employed in the past, deteriorating mental illness increasingly impairs ability to work. Prognosis is poor. Ultimately work becomes impossible. This may be true despite the absence of active delusions. Medication may control delusions and bizarre behavior, but at the same time promote symptoms which make a patient unable to work. Dr. Braun described this as "[t]he inability to perform behavior as opposed to performing bizarre behavior." Others testified to the lack of correlation between an ability of a mentally ill person to perform daily activities such as household chores and the ability to cope in a work environment.

As noted by Dr. Anne Geller, those suffering from schizophrenia have a particularly difficult time coping with a work situation:

> The basic underlying symptomology of the disease is a disorder affecting ability of any kind of an emotional response to people, disorder of attention, disorder of energy and inability to get motivated to get started.... And you're left with this residual person. This person ... is really unable to sustain a kind of activity for any period of time.

The mentally ill are particularly vulnerable to bureaucratic errors. Some do not even understand the communications they receive from SSA. Others are afraid of the system. Even with help from social workers and others, many do not appeal denials or terminations.

An erroneous termination or denial of benefits to a mentally ill person means more than that he or she will no longer receive benefits. To many it may mean a severe medical setback. Dr. Braun testified that one of her patients who had not been hospitalized for fifteen years was hospitalized as a result of the trauma of having benefits cut off. This was not a unique case. Some slip into acute paranoia while others become suicidal.

## D. Practices and Directives

Contrary to legal requirements, the Social Security Administration has consistently followed a policy which presumes that mentally disabled claimants who do not meet or equal the listings necessarily retain sufficient residual functional capacity to do at least "unskilled work." Sequential evaluation ends without assessing residual functional capacity or ability to engage in work. For younger individuals (those under 50 years of age), the presumption of ability to work is effectively conclusive. For older individuals (those over 50 years of age), the presumption applies with equal force and will also result in a denial of benefits unless the claimant not only has a severely impaired RFC, but also has extreme deficiencies in the other "vocational factors" of education and work experience. The means of enforcement of the policy, through internal memoranda, returns, and reviews, has meant that the affected SSD or SSI applicant as well as counsel, social workers and advisers for a long time were unaware of its existence.

Evidence at trial revealed that this covert policy was followed consistently from 1978 until at least the early months of 1983. In 1983 the Social Security Administration yielded to pressure to allow medical vocational allowances for those with mental disabilities. The change was precipitated only after the filing of this lawsuit and after a preliminary injunction was issued on December 22, 1982, in the case of *Mental Health Association of Minnesota v. Schweiker*, 554 F.Supp. 157 (D.Minn.1982), *aff'd.*, 720 F.2d 965 (8th Cir.1983). The Minnesota Court declared the policy challenged in the instant case to be illegal within the Chicago Region of SSA.

Evidence of the fixed clandestine policy against those with mental illness is overwhelming. In 1978, the New York Office of Disability Determinations recognized that virtually all of the mental disability cases in which it had allowed benefits upon medical vocational grounds had been reversed by the Central Office of SSA upon

Tier III review. When the New York Regional SSA officials failed to follow suit in Tier II reviews, the State sought clarification of the policy to avoid being caught between conflicting levels of review. The response from Baltimore was a very clear pronouncement that allowances in cases of mental disability should not be granted unless the listings of impairments were met.

The effects of the clarification of policy were described at length by Dr. Geller. Commenting in particular on a group of severely ill individuals who in her opinion clearly could not work, she testified that her findings in favor of granting disability benefits were flatly overruled. She understood from Tier III reviews that "in younger workers medical vocational allowances are not considered when the impairment is psychiatric." Marvin Lachman similarly testified that only older workers were able to get medical vocational allowances for mental disorders. He estimated that the effect of SSA's policy was to cut the number of disability allowances in psychiatric cases in half.

Dr. Maurice Osinoff—a consulting psychiatrist with the State Office of Disability Determinations who was called as a witness for the defense—confirmed that prior to 1982 he had *never* seen an allowance of benefits for a mentally ill younger worker who did not meet the listings; this was despite the fact that he saw "many" cases where he and his colleagues did not themselves believe that the claimant could work. This result made him "uncomfortable" since it did not square with what he knew as a doctor. Dr. Theodore Cohen, a supervising consulting psychiatrist for the State ODD, similarly affirmed his understanding of SSA policy that a medical vocational allowance for a younger worker should not be allowed.

The distainful professional attitude towards the assumption of Baltimore that these claimants could really work is summarized by the following quotations from the record. Dr. Geller testified that Baltimore was telling her:

Somewhat like Candide in the best possible world these people can find employment and sustain employment, basically they do have the capacity in some fantasyland of getting and maintaining employment.

Dr. Arthur Meyerson declared in regard to SSA's Psychiatric Review Form, that:

[T]here is no way you can take the complex of human behaviors recorded in the psychiatric history, or even a summary of a single hospitalizations and narrow it down to 17 numbers. That is absolutely ludicrous. And if you're trying to do it for determination of one's capacity to work, I don't know if it becomes more or less ludicrous; but its a silly notion.

The confidential policy was reiterated in a series of unpublished internal memoranda which were circulated within SSA from 1979 through 1982. The most incriminating was issued by Dr. Jose Puig, then SSA's Acting Chief Consultant in psychiatry. He wrote:

In the Mental Disorders, at least, a Total Psychiatric Impairment rating of less than "5" signifies the ability to engage in SGA [substantial gainful activity] at the level of unskilled work or higher. Where it does not mean that, the PRF [psychiatric review form] is being improperly used. Thus, where the PRF is properly employed, a separate RFC rating would be redundant and tantamount to giving double weight to the same case aspects.

This document was issued despite the sequential evaluation regulations which require a *separate assessment* of RFC and ability to engage in substantial gainful activity when a claimant has a severe impairment (3 or 4 on the 5 point scale) but does not meet the listings.

Although there is evidence that the *sub rosa* policy is no longer in effect, the adverse influence on those terminated remain. In addition, New York City and State suffered expensive demands on their social service agencies, hospitals and shelters as a result of SSA's surreptitious undermining of the law.

## II. Law and Application

### A. Jurisdiction

Plaintiffs allege jurisdiction under the Social Security Act, 42 U.S.C. § 405(g), the mandamus statute, 28 U.S.C. § 1361, and the general federal question statute for violations of the Administrative Procedure Act, 5 U.S.C. § 553, the Freedom of Information Act, 5 U.S.C. § 552 and the due process clause of the Constitution. Because the court has jurisdiction under both the Social Security Act and the mandamus statute, it is not necessary to reach the question of jurisdiction over federal question claims pursuant to section 1331 of title 28.

### 1. *42 U.S.C. § 405(g)*.

■ For a court to have jurisdiction under section 205(g) of the Social Security Act (42 U.S.C. § 405(g)), the claimant must have presented his or her claim to the Social Security Administration. *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976); *Smith v. Schweiker*, 709 F.2d 777 (2d Cir.1983). Defendants argue that not all of the class members have satisfied this threshold requirement. All those who have applied for benefits and had them denied by the Secretary meet the requirement because the Secretary has made a decision. *See Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18.

Those class members who have had their benefits terminated under the continuing disability review also meet the presentment requirement. Plaintiffs' witnesses have testified and SSA's own internal guidelines demonstrate that those terminated under the continuing disability review who were determined not to be disabled because of their capacity for substantial gainful activity (the definition of the class) must have returned a questionnaire to SSA. If they had not done so, their benefits would have been terminated for non-cooperation.

■ Presentation need not be by a formal communication. *See Mathews v. Eldridge*, 424 U.S. 319, 329, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976) (answer to state questionnaire and letter to state disability department enough); *cf. Wheeler v. Heckler*, 719 F.2d 595, 600 (2d Cir.1983) (the presentment requirement is to be construed liberally but is not met when plaintiffs do not allege even informal communications with SSA). Unlike the class in *Heckler v. Lopez*, — U.S. —, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983) (Rehnquist, Circuit Justice), the class in this case does not include persons "who have never questioned the initial determination that they cease to be be disabled." *Id.* 104 S.Ct. at 15.

■ A claimant also must have exhausted his or her administrative remedies in order to seek relief under section 205(g) except for two circumstances. First, the exhaustion requirement may be waived by the Secretary. *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). Second, the case is one "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Id.* at 300, 96 S.Ct. at 900.

In *Eldridge*, the Court cited the factors which led it to conclude that Eldridge need not exhaust administrative remedies. His claim to a predeprivation hearing was "collateral" to his claim for benefits and he raised a colorable claim that "because of his physical condition and dependency upon the disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments." *Id.* The Second Circuit has interpreted *Eldridge* liberally to mean that:

A waiver of the exhaustion requirement may be inferred where the plaintiffs' legal claims are collateral to their demand for benefits, where exhaustion would be a *pro forma* or futile gesture, or where the harm suffered in the interim would be irreparable in the sense that no *post hoc* relief would be adequate.

*Smith v. Schweiker*, 709 F.2d 777, 780 (2d Cir.1983).

Plaintiffs' claims are collateral to their demand for benefits. They challenge the Secretary's failure to follow her own regulations and properly implement regulations in

accordance with the Administrative Procedure Act. Plaintiffs do not challenge the substantive standards the Secretary uses to determine entitlement to benefits as did plaintiffs in *Heckler v. Lopez* and *Smith v. Schweiker.*

Exhaustion has been and would have been futile in challenging the Secretary's backdoor policy. In *Heckler v. Lopez,* — U.S. ——, 104 S.Ct. 10, 15, 77 L.Ed.2d 1431 (1983), Justice Rehnquist emphasized that exhaustion should be required when a claim "could benefit from further factual development and refinement through the administrative process." These claims could not because there is "internal disarray within the Social Security Administration." *Smith v. Schweiker,* 709 F.2d 777, 781 (2d Cir.1983). The evidence demonstrates that the State Office of Disability Determinations and the Regional Office both were adhering to a policy they believed contrary to the regulations because of pressure from Tier III reviews from Baltimore.

Reversal of an individual decision by an Administrative Law Judge could not alleviate the problem of other members of the class. Reversal would be on the fact of individual disability, not the illegal procedure. Even the administrative judges were unaware that the review physicians were deciding the residual functional capacity of a claimant on the basis of a *per se* policy rather than on medical judgment. Members of the class could not attack a policy they could not be aware existed.

Exhaustion serves no purpose in such a situation. *See Mercer v. Birchman,* 700 F.2d 828, 832 (2d Cir.1983) (exhaustion required because alleged procedural problems were acknowledged to be a deviation from established agency policy and were corrected, but exhaustion would not be required when conflict between coordinate agencies rendered administrative remedy illusory); *Mental Health Association v. Heckler,* 720 F.2d 965, 970–71 (8th Cir. 1983) (in case challenging policies similar to those in issue here, exhaustion waived because the procedural problem remains unaddressed even if in an individual case benefits were obtained); *Jones v. Califano,* 576 F.2d 12, 18, 19 (2d Cir.1978) (exhaustion waived in case challenging Secretary's continued adherence to position routinely rejected by Appeals Council).

Harm to members of the plaintiff class is irreparable. Loss of benefits is not the only damage termination causes to a mentally ill person. The ordeal of having to go through the administrative appeal process may trigger a severe medical setback. Many persons have been hospitalized due to the trauma of having disability benefits cut off. Interim benefits will not adequately protect plaintiffs from this harm. Nor will ultimate success if they manage to pursue their appeals. *See Mental Health Association v. Heckler,* 720 F.2d 965, 970 (8th Cir.1983) ("the irreparable harm inherent in the pursuit of administrative relief ... [is] not alleviated but rather [is] exacerbated by the high reversal rate on appeal"). Because of their disability, many members of the class were incapable of challenging the bureaucracy.

### 2. *28 U.S.C. § 1361*

█ The Second Circuit has held mandamus jurisdiction, 28 U.S.C. § 1361, available in appropriate social security cases. *Ellis v. Blum,* 643 F.2d 68 (2d Cir.1981). The Eight Circuit applied *Ellis* to hold mandamus jurisdiction available in the case before it challenging practices similar to those involved in this case. *Mental Health Association v. Heckler,* 720 F.2d 965 (8th Cir.1983). Mandamus jurisdiction lies where the claims are "against the secretary for failure to comply" with regulations. *Smith v. Schweiker,* 709 F.2d 777, 779 (2d Cir.1983). This challenge can be characterized as either the Secretary's failure to comply with regulations or as the issuance of *de facto* secret regulations. Thus the fact that plaintiffs seek reinstatement of benefits while the Secretary redetermines their eligibility for benefits by following the regulations does not bar mandamus. *See Ellis v. Blum, supra,* at 82.

■ Application of traditional principles of mandamus confirms its appropriateness here. Plaintiffs seek an order compelling the Secretary to comply with her regulations requiring an assessment of the residual functional capacity for each claimant who has a severe impairment but does not meet the listings. While the individual assessment requires the exercise of judgment and discretion, the Secretary has no discretion to refuse to perform that step or to perform it in such a way as to be meaningless. In similar circumstances, the writ has issued. *See, e.g., Ellis v. Blum,* 643 F.2d 68 (2d Cir.1981) (mandamus available to compel Secretary to comply with notice requirements); *Jones v. Califano,* 576 F.2d 12 (2d Cir.1978) (mandamus available to compel Secretary to comply with Appeals Council rulings concerning method of computing retroactive benefits); *White v. Mathews,* 559 F.2d 852 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978) (mandamus available to compel Secretary to comply with time requirements in processing claims).

Those cases in which the Second Circuit has denied mandamus jurisdiction are clearly distinguishable. They did not involve a failure of the Secretary to follow the Social Security statute or its regulations. *See, e.g., Wheeler v. Heckler,* 719 F.2d 595, 598 n. 1 (2d Cir.1983) (mandamus unavailable in "challenge calling for an adjustment in the rules for determining whether an individual is entitled to benefits"); *Mercer v. Birchman,* 700 F.2d 828, 835 (2d Cir.1983) (mandamus unavailable because plaintiffs only demonstrated that "in a few instances the eminently fair procedures set up by the Secretary ... had broken down").

■ Exhaustion of administrative remedies is required in mandamus cases, but the same principles of waiver apply as for jurisdiction under section 205 of the Social Security Act. *See Mercer v. Birchman,* 700 F.2d 828, 832 (2d Cir.1983); *Ellis v. Blum,* 643 F.2d 68, 81 (2d Cir.1981). For the same reasons discussed in reference to 42 U.S.C. § 405(g), exhaustion is deemed waived for purposes of jurisdiction under the mandamus statute, 28 U.S.C. § 1361. *Cf. Kennedy v. Harris,* 87 F.R.D. 372, 376–77 (S.D.Cal.1980) (sixty day filing requirement of Social Security Act inapplicable when jurisdiction premised on mandamus).

B. Standing of State and City of New York

■ The State and City claim standing to maintain this action both on their own behalf and in a *parens patriae* capacity on behalf of their citizens.

*1. Own Injuries*

■ The determination of standing entails examination of both constitutional and prudential principles. "Article III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). In addition the party must demonstrate that the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. at 472, 102 S.Ct. at 758 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

Both the State and City meet the injury in fact requirement. Each has suffered economic injury in having to meet the needs of those removed from the disability rolls by the Secretary's policy. Their shelter programs, welfare system, and hospitals have been burdened. The project coordinator for an SSI outreach program in the City's shelter program for the homeless estimated that 40% of those housed in the shelters had been denied or terminated from SSI or SSD benefits. At least one third of those housed in the system had a history of psychiatric hospitalization.

A study by the New York State Department of Social Services estimated that if 85% of those terminated from Social Security in 1982 applied for public assistance, a $26.9 million increase in annual expenditures would be expected, of which the State and local governments would bear a substantial portion. The same study estimated that 33% of those terminated had been receiving benefits for a mental disability. Finally, an employee of the New York State Office of Mental Health Community Services testified that it costs approximately $1000 in staff time to help a mentally ill client pursue an appeal of denial of benefits to the Administrative Law Judge level.

The evidence is more than sufficient to support a finding of injury in fact. *See New York v. Schweiker*, 557 F.Supp. 354, 358 (S.D.N.Y.1983) (requirement satisfied by State proof of danger of "having to cope with the adverse health and social consequences of increased unwanted adolescent pregnancy and the financial burdens of additional persons in need of public assistance").

Also met is the requirement that the injury will be redressed by a favorable decision. If any of those who were terminated from benefits are restored to the rolls the City and State will be eligible to claim a portion of the retroactive benefits to cover services provided to the individuals when they were not receiving their benefits. The City and State also will be able to recover medical payments made on behalf of those later determined to have been wrongly denied SSI benefits because SSI eligibility entitles an individual to Medicaid. Substantial future payments for hospital care, shelter, welfare and social services will also be avoided. *See Graham v. Schweiker*, 545 F.Supp. 625, 627 (S.D.Fla. 1982) (in action by Florida challenging refugee relief regulations, State allowed to sue in proprietary capacity to seek "recovery of funds" and avoid "future payments").

In addition to the Article III requirements, the Court has developed "prudential" considerations that limit standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 758–60, 70 L.Ed.2d 700 (1982). Given this Court's determination that it has jurisdiction over the class's claims, it may not be necessary to reach the standing issue, especially the prudential considerations. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977) (since Court has at least one plaintiff before it with standing to assert rights, no need to consider standing of other plaintiffs). Nevertheless, the court finds that the City and State meet the prudential standing requirements. The injuries claimed by the City and State are not only those suffered by third parties, nor is the injury a "generalized grievance." *See Valley Forge*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The State and City do claim injury to their citizens as the basis for *parens patriae* standing but in addition claim and have suffered injury to their own interests.

Finally, the State's and City's interests must be arguably "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), *quoted in Valley Forge*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700. In determining whether a party falls within the "zone of interests" of a challenged statute, the court may look to the terms of the statute, its purpose and any relevant legislative history. *Control Data Corp. v. Baldridge*, 655 F.2d 283, 294 (D.C. Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). "The challenging party need only show that it is an intended beneficiary of the statute, not necessarily the primary one." *Constructores*

*Civiles de Centroamerica S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972). "[U]nless the legislative history shows the plaintiff to be clearly not within the statute's 'zone of interests,' a court should demand no more than a sensible relation between some subject of the statute and the plaintiff's interest in the outcome of the litigation." *National Collegiate Athletic Ass'n v. Califano,* 622 F.2d 1382, 1386 (10th Cir.1980). Since the "zone of interests" is a prudential standing consideration, a court should be hesitant to deny a party standing on this basis alone without clear evidence of a legislative intent to restrict access to judicial review. *Cf. Barlow v. Collins,* 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970).

■ The Social Security disability and SSI programs were enacted in part to relieve state and local welfare burdens. This purpose is apparent, in the first place, from the language of the statute itself. For example, the SSI statute provides that the Secretary may enter into an agreement with the states to administer optional programs of state supplementation, and to determine eligibility for medical assistance. 42 U.S.C. § 1382e. The Secretary is also required to reimburse states for their costs in servicing blind or disabled people under state vocational rehabilitation programs. 42 U.S.C. §§ 422(d), 1382d.

The states, in turn, are required to maintain the same level of SSI benefits they provided to people who were receiving benefits under federal-state programs that were replaced by the SSI program (Pub.L. 93–66, Title II, Part B, § 212, *as amended*), and to continue to pass-through cost-of-living increases to SSI recipients. 42 U.S.C. § 1382. *See also* 42 U.S.C. § 1382i(d) (funds appropriated for medical and social services pilot program for certain handicapped individuals); 42 U.S.C. § 1383(g) (reimbursement to states for interim assistance payments).

In addition, the relevant legislative history of both the SSD and the SSI statutes support the City's and the State's standing to bring an action against federal policies that violate the statute and have the effect of shifting the financial burden for the disabled back to the states and municipalities. Before the SSD program was enacted in 1956 the burden of caring for the disabled rested entirely on state, local, community and private sources. The Senate report to the 1956 Act stated that many of the disabled were supported by "State and local general assistance programs." S.Rep. No. 2133, 84 Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad. News 3877, 3880.

In 1960, the SSD program was amended to permit disabled workers under age fifty to qualify for federal benefits. The Senate Committee Report stated that "many [of the disabled] who would be eligible for disability benefits except for the age limitation are now receiving payments under public assistance programs. With insurance benefits available to them, some of these individuals would no longer need assistance payments." The Committee also estimated a savings of $28 million in state and local public assistance expenditures as a result of the bill. S.Rep. No. 1856, 86th Cong., 2d Sess., *reprinted in* 1960 U.S. Code Cong. & Ad.News 3608, 3623.

■ In 1972, the SSI program was enacted to provide a uniform federal cash assistance grant for the indigent aged, blind and disabled. At the same time Congress repealed existing federal-state programs that provided cash assistance to these categories of people at state option with a partial state-local financial contribution. The legislative history of the 1972 amendments establishes that one of the purposes of the new federal SSI program was to relieve state and local governments of the soaring costs of the existing programs. The House Report supporting the 1972 legislation found that "the bill would provide ... very substantial relief to the states and localities." H.R.Rep. No. 231, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 4992. *See also* 117 Cong.Rec. H21092 (June 21, 1971) (statement of Rep. Mills; the new federal costs represent "fiscal relief for

state and local governments"). The Report estimated that the bill would save the state and local governments of New York $188.4 million in welfare expenditures in fiscal year 1973. H.R.Rep. No. 231, *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 5202.

The City and State plaintiffs clearly satisfy the broad requirement of being "arguably" within "the zone of interests" of the SSD and SSI programs. They challenge federal policies and practices that have the effect of shifting the financial burden of caring for the needy disabled back to the state and local governments. Defendant relies upon the fact that the District Court of Maryland has held that a state does not have standing to challenge terminations under the SSD program. *Doe v. Heckler*, 568 F.Supp. 681 (D.Md.1983). That court, however, did not consider the legislative history of the programs and explicitly did not reach the issue of standing under the SSI program. *Id.* at 683. Moreover, the challenge in *Doe v. Heckler* was to the validity of termination regulations. The challenge here is to the Secretary's failure to follow the statute and her own regulations. This failure has negated many of the benefits to state and local treasuries of the SSD and SSI programs. Since the City and State plaintiffs satisfy both Article III requirements and the prudential standing considerations, they have standing to maintain this action on their own behalf.

### 2. *Parens Patriae* Standing

A "state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982). Such an interest will support *parens patriae* standing. *Id.* There is no question that those interests are implicated in this case. As the Court pointed out in *Snapp*, *parens patriae* had its genesis in the English Crown's perogative to take responsibility for those with mental incapacity. *Id.* 102 S.Ct. at 3265.

While not legally incapacitated, members of the class have many of the characteristics of those who are.

In *Snapp*, however, the Court stated in dicta that "a state does not have standing as *parens patriae* to bring an action against the federal government." *Id.* 102 S.Ct. at 3270 n. 16. The statement is in a footnote to the Court's decision upholding *parens patriae* standing for Puerto Rico to sue apple growers for alleged violations of federal anti-discrimination laws. As authority for the statement, the Court cites *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S.Ct. 597, 600–01, 67 L.Ed. 1078 (1923). Massachusetts had sued the secretary of the treasury challenging the constitutionality of an appropriations act. On the issue of whether Massachusetts could sue as the representative of its citizens, the Court held:

> *We need not go so far as to say that a state may never intervene by suit to protect its citizens* against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here.... [T]he citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens ... it is no part of its duty or power to enforce their rights in respect of their relations with the federal government.

262 U.S. at 485–86, 43 S.Ct. at 600 (emphasis added). In this case, New York does *not* seek to protect its citizens from the operation of a statute. It seeks to *enforce* both the social security statute and the Administrative Procedure Act. Massachusetts had invoked the Court's original jurisdiction. The Court's understandable desire to restrict that jurisdiction may explain its decision and later reliance on it. *See e.g., Jones ex rel. Louisiana v. Bowles*, 322 U.S. 707, 64 S.Ct. 1043, 88 L.Ed. 1551 (1944) (refusal to allow filing of complaint in Su-

preme Court). *See also Snapp*, 102 S.Ct. at 3271 (Brennan, J., concurring) ("the question whether a State can bring a *parens patriae* action within the original jurisdiction of this Court may well turn on considerations quite different from those implicated where the State seeks to press a *parens patriae* claim in the district courts"); `Hart & Wechsler, The Federal Courts and the Federal System, 275–277 (2d ed. by P.M. Bator, D.L. Shapiro, P.J. Mishkin and H. Wechsler, 1973), 1981 Supp. at 100.

In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Court also held that Massachusetts had no standing to sue on its own behalf on a theory of Congressional usurpation of power:

> [T]he complaint of the plaintiff state is brought to the naked contention that Congress has usurped the reserved powers of the several states by the mere enactment of the statute, though nothing has been done and nothing is to be done without their consent; and it is plain that the question, as it is thus presented, is political, and not judicial in character, and therefore is not a matter which admits of the exercise of judicial power.

262 U.S. at 483, 43 S.Ct. at 599. This aspect of the case may also go a long way toward explaining the holding on *parens patriae*. *See Washington Utilities & Transportation Commission v. F.C.C.*, 513 F.2d 1142, 1153 (9th Cir.1975) (distinguishing *Mellon* in same fashion), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

The Ninth Circuit has upheld *parens patriae* standing of a state against an agency of federal government. *Washington Utilities & Transportation Commission v. F.C.C.*, 513 F.2d 1142 (1975). That court held the *Mellon* doctrine inapplicable where the state sought "to vindicate the congressional will by preventing what it asserts to be a violation of a statute by the administrative agency charged with its enforcement." *Id.* at 1153. That is the situation we face. *See also Carey v. Klutznick*, 637

F.2d 834, 838 (2d Cir.1980) (New York State has standing to sue Census Bureau both on *parens patriae* grounds and for injury to own interests; no discussion of *Mellon* ), *rev'd on other grounds*, 653 F.2d 732 (2d Cir.1981), *cert. denied*, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). *But see Graham v. Schweiker*, 545 F.Supp. 625, 627 (S.D.Fla.1982) (suit by Florida challenging regulations for refugee funding implicates *parens patriae* interests; such interests may not be asserted against the federal government); *Pennsylvania v. Kleppe*, 533 F.2d 668, 676–77 (D.C.Cir.1976), *cert. denied*, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976) (in suit by Pennsylvania against Small Business Administration for alleged incorrect classification in hurricane relief program, held that whether or not the *Mellon* doctrine bars all *parens patriae* actions against the federal government, federalism concerns warrant denying standing in such cases).

The *Mellon* doctrine is inapplicable in the instant case. New York does not question the validity of a federal statute. Nor does it invoke the Supreme Court's original jurisdiction. It merely joins a class of its citizens, who are incapable of acting effectively for themselves because they are mentally disabled, in seeking to require the Secretary to adhere to her own regulations.

■■■ A city generally does not have *parens patriae* standing. *See California v. Automobile Manufacturers Association, Inc.*, 481 F.2d 122 (9th Cir.1973), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *City of Hartford v. Town of Glastonbury*, 561 F.2d 1032, 1046–47 (2d Cir.1976) (Meskill, J., dissenting), *rehearing en banc*, 561 F.2d 1048 (2d Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978). Because the City has standing to sue for injury to its own interests, its standing on *parens patriae* grounds need not be addressed.

### C. Mootness

■■■ Defendant asserts that several of the named plaintiffs' claims are moot because they are now receiving benefits.

The doctrine only bars the claim of Jane Doe II because, as plaintiffs admit, she received a favorable decision from an Administrative Law Judge one week before the complaint was filed. The rest of the named plaintiffs who are now receiving benefits may represent the class because their administrative success came after class certification. *Wheeler v. Heckler*, 719 F.2d 595, 600 (2d Cir.1983) (citing *Jones v. Califano*, 576 F.2d 12, 22 (2d Cir.1978)).

## D. Timeliness

 The Social Security Act requires that a party seek judicial review within sixty days of the final decision of the Secretary "or within such further time as the Secretary may allow." 42 U.S.C. § 405(g). Plaintiffs argue that the defendant may not raise the requirement as a bar now because the objection is not made in a timely fashion. *See Mathews v. Eldridge*, 424 U.S. 319, 328 n. 9, 96 S.Ct. 893, 899 n. 9, 47 L.Ed.2d 18 (Court does not consider whether sixty day requirement is met since not raised below in time, citing Fed.R. Civ.P. 8(c) and Rule 12(h)(1)). The sixty day requirement is a statute of limitations and is waivable by the parties. It is not jurisdictional. *Id.; Weinberger v. Salfi*, 422 U.S. 749, 763–64, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975).

The Secretary raises the issue for the first time in her post-trial brief. This is rather late. *See Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1155 (2d Cir.1968) ("[T]he Statute of Limitations is an affirmative or so-called 'personal privilege' defense which may be waived if not promptly pleaded, Fed.R.Civ.P. 8(c)."). In addition, the same reasons which justify implying waiver of the exhaustion requirement are stronger for the sixty day requirement because the statute of limitations is not, as is the exhaustion requirement, "central to the requisite grant of subject-matter jurisdiction." *Weinberger v. Salfi*, 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975). *See also Kennedy v. Harris*, 87 F.R.D. 372, (S.D.Cal.1980) ("Where the purpose of the sixty day rule is to forestall the filing of belated or stale claims, it is not compelling in a class action ... based on a challenge to a policy of the Secretary which applies ... to all litigants.").

## E. Illegal Acts by Defendant

 The Social Security Act and its regulations require the Secretary to make a realistic, individual assessment of each claimant's ability to engage in substantial gainful activity. *See Heckler v. Campbell*, — U.S. ——, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983). The class plaintiffs did not receive that assessment. On the contrary, SSA relied on bureaucratic instructions rather than individual assessments and overruled the medical opinions of its own consulting physicians that many of those whose claims they were instructed to deny could not, in fact, work. Physicians were pressured to reach "conclusions" contrary to their own professional beliefs in cases where they felt, at the very least, that additional evidence needed to be gathered in the form of a realistic work assessment. The resulting supremacy of bureaucracy over professional medical judgments and the flaunting of published, objective standards is contrary to the spirit and letter of the Social Security Act.

The Secretary's practices have violated the requirements of her own regulations. Defendants have ignored the five step sequential evaluation process by presuming that the failure to meet listings at step three or four of the process automatically translates into a residual functional capacity to do unskilled work at steps four and five. The bureaucratic assessment of residual functional capacity if it was done at all was reduced to a paper charade where the SSA physician completed a cursory report or checked off a form knowing the conclusion had to be that the claimant had the capacity for unskilled work. Medical experts demonstrated to the court that the symptoms and restrictions of the listings of impairments do not measure an individual's capacity for work or his or her ability to withstand the stress of even the least demanding work. A denial of benefits on the

basis utilized by the Secretary is arbitrary and contrary to the statute and regulations. Although the Secretary may rely on rulemaking to resolve classes of issues, the rules as applied may not conflict with the statute. *Heckler v. Campbell,* —— U.S. ——, 103 S.Ct. 1952, 1957, 1958, 76 L.Ed.2d 66 (1983).

Because the Secretary no longer is following the illegal policy in adjudicating cases, there is no need to reach plaintiff's contention that the illegal rule violated the Administrative Procedure Act and that the Secretary should be required to begin notice and comment procedures to implement a regulation covering the determination of residual functional capacity for mentally disabled individuals.

■ Plaintiffs also allege that the Secretary's policy violates plaintiff class members' due process rights. The finding that the policy is contrary to the social security statute, obviates the need to reach the constitutional issue. *See Califano v. Yamasaki,* 442 U.S. 682, 692, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979) ("A court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question.").

III. Relief

The Secretary's illegal policy has affected all class members who have been denied, or terminated from, benefits. As was conceded by defendants' own witness, administrative law judges routinely give great weight to the finding on residual functional capacity which is entered in the record by the state agency's internal review physician. Had the administrative law judges known that the assessment of residual functional capacity was not based on the doctor's professional opinion, the results in many cases might well have been different.

The decisions denying benefits or terminating benefits must be reopened and determined by the Secretary using proper standards. The usual administrative appeal rights will follow. In the interim the Secretary will, from the date of this order, reinstate benefits of all class members until the claimant's eligibility is properly determined by the Secretary. No retroactive benefits will be awarded until the Secretary determines whether or not the initial denial was correct.

■ This relief is within this court's remedial powers under the Social Security Act. Class relief is available in actions brought under section 205(g) of the Act. *Califano v. Yamasaki,* 422 U.S. 682, 698–701, 99 S.Ct. 2545, 2556–58, 61 L.Ed.2d 176 (1979). Injunctive relief is also available. *Id.* at 704–06, 99 S.Ct. at 2559–60. Interim payments are an appropriate form of relief for a procedural violation of the social security statute. *See Mental Health Association of Minnesota v. Heckler,* 720 F.2d 965 (8th Cir.1983); *Day v. Schweiker,* 685 F.2d 19, 23–24 (2d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983); *White v. Mathews,* 559 F.2d 852, 861 (2d Cir.1977) (the Social Security Act does not "exclude the possibility of interim payments ordered by a court exercising its remedial power"), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). *See also Novak v. Harris,* 504 F.Supp. 101, 107–08 (E.D.N.Y.1980) (sovereign immunity does not bar award of retroactive benefits; Social Security Act operates as a waiver of sovereign immunity). Mandamus jurisdiction also supports an allowance of interim benefits. *See Ellis v. Blum,* 643 F.2d 68, 81 (2d Cir.1981); *Schisler v. Heckler,* 574 F.Supp. 1538, 1546 (W.D.N.Y.1983).

This memorandum and order constitutes a final judgment. Rule 58, Federal Rules of Civil Procedure. It embodies findings of fact and law. Rule 52, Federal Rules of Civil Procedure.

The judgment is stayed for ten days to permit application for a stay to the Court of Appeals.

So ordered.